1  Rosemary M. Rivas (State Bar No. 209147)
   Email: rrivas@zlk.com
2  **LEVI & KORSINSKY, LLP**
   44 Montgomery Street, Suite 650
3  San Francisco, CA 94104
   Telephone: (415) 291-2420
4  Facsimile: (415) 484-1294

5  Donald J. Enright (to be admitted *pro hac vice*)
   Email: denright@zlk.com
6  Elizabeth K. Tripodi (to be admitted *pro hac vice*)
   Email: etripodi@zlk.com
7  **LEVI & KORSINSKY, LLP**
   1101 30th Street NW, Suite 115
8  Washington, DC 20007
   Tel: (202) 524-4290
9  Fax: (202) 337-1567

10 *Counsel for Plaintiff SAMUEL P. CLARKE*

11

12                    **UNITED STATES DISTRICT COURT**

13                   **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

14

15 | SAMUEL P. CLARKE, | Case No. 3:17-cv-06687 |
|---|---|
| Plaintiff, | **COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934** |
| v. | |
| OCERA THERAPEUTICS, INC., ECKARD WEBER, LINDA GRAIS, WENDELL WIERENGA, ANNE VANLENT, STEVEN JAMES, NINA KJELLSON, WILLARD DERE, MALLINCKRODT PLC, MAK LLC, and MEH ACQUISITION CO., | **JURY TRIAL DEMANDED** |
| Defendants. | |

Case No. 3:17-cv-06687
COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff, Samuel P. Clarke, by his undersigned attorneys, alleges upon information and belief, except for his own acts, which are alleged on knowledge, as follows:

**NATURE OF THE ACTION**

1. Plaintiff brings this action against Ocera Therapeutics, Inc., a ("Ocera" or the "Company") and Ocera's Board of Directors (collectively, the "Board" or the "Individual Defendants," as further defined below) for violations of Section 14(d)(4), and Rule 14D-9 promulgated thereunder by the U.S. Securities and Exchange Commission (the "SEC"), and Sections 14(e) and 20(a). Specifically, Defendants solicit the tendering of stockholder shares in connection with the proposed acquisition of the Company by MEH Acquisition Co. ("Purchaser"), a Delaware corporation and a direct wholly owned subsidiary of MAK LLC ("Parent"), a Delaware limited liability company and an indirect wholly-owned subsidiary of Mallinckrodt plc (together with Purchaser and Parent, "Mallinckrodt"), an Irish public limited company (the "Proposed Transaction"), through a recommendation statement that omits material facts necessary to make the statements therein not false or misleading. Stockholders need this material information to decide whether to tender their shares or pursue their appraisal rights.

2. On November 2, 2017, the Company announced that it had entered into a definitive agreement (the "Merger Agreement"), by which Mallinckrodt would commence a tender offer (the "Tender Offer") to acquire all of the outstanding shares of Ocera common stock for $1.52 per share (the "Closing Amount"), net to the holder in cash, plus one non-transferrable contingent value right per Share (each, a "CVR"), which represents the contractual right to receive one or more payments in cash currently estimated to be up to $2.58 in the aggregate ("Contingent Consideration"), contingent upon the achievement of certain milestones (the "Merger Consideration") in a transaction valued up to $117 million (the "Proposed Transaction"). The Tender Offer, commenced on November 9, 2017, and is set to expire at one minute after 11:59 p.m., Eastern Time, on December 8, 2017.

3. In connection with the commencement of the Tender Offer, on November 9, 2017, the Company filed a Recommendation Statement on Schedule 14D-9 (the "Recommendation Statement") with the SEC. The Recommendation Statement is materially deficient and misleading

because, inter alia, it omits to disclose material information concerning the data and inputs underlying the financial valuation analyses that support the fairness opinion provided by the Company's financial advisor, MTS Health Partners, L.P. (collectively with its affiliate MTS Securities LLC, "MTS"). Without this material information, Ocera stockholders will be forced to decide whether or not to tender their shares based upon materially incomplete and misleading information. The failure to adequately disclose such material information constitutes a violation of Sections 14(d)(4), 14(e), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

4. For these reasons and as set forth in detail herein, the Individual Defendants have violated federal securities laws. Accordingly, Plaintiff seeks to enjoin the Proposed Transaction or, in the event the Proposed Transaction is consummated, recover damages resulting from the Individual Defendants' violations of these laws. Judicial intervention is warranted here to rectify existing and future irreparable harm to the Company's stockholders.

## JURISDICTION AND VENUE

5. The claims asserted herein arise under Sections 14(d), 14(e), and 20(a) of the Exchange Act, 15 U.S.C. § 78aa. The Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

6. The Court has personal jurisdiction over each of the Defendants because each conducts business in and maintains operations in this District or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as pursuant to 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Ocera maintains its principal place of business in this District and each of the Individual Defendants, and Company officers or directors, either resides in this District or has extensive contacts within this District; (iii) a substantial portion of the transactions and wrongs complained of herein occurred in this District; (iv) most of the relevant documents pertaining to Plaintiff's claims are stored (electronically and otherwise), and evidence exists, in this District; and

1  (v) Defendants have received substantial compensation in this District by doing business here and
2  engaging in numerous activities that had an effect in this District.

**PARTIES**

8. Plaintiff is, and has been at all relevant times, the owner of shares of Ocera common stock.

9. Defendant Eckard Weber ("Weber") has served as Chairman of the Board of Ocera since 2013.

10. Linda S. Grais ("Grais") has been President and Chief Executive Officer ("CEO") and a director of the Company since 2013.

11. Defendant Wendell Wierenga ("Wierenga") has served as a director of the Company since 2013.

12. Defendant Steven P. James ("James") has served as a director of the Company since 2014.

13. Defendant Nina Kjellson ("Kjellson") has served as a director of the Company since 2013.

14. Defendant Anne M. VanLent ("VanLent") has served as a director of the Company 2011.

15. Defendant Willard H. Dere ("Dere") was elected to serve as a director of the Company on October 26, 2016.

16. Defendants Dere, VanLent, Kjellson, James, Weirenga, Grais, and Weber are collectively referred to herein as the "Board" or the "Individual Defendants."

17. Defendant Ocera is a corporation organized and existing under the laws of the State of Delaware. The Company maintains its principal executive offices at 555 Twin Dolphin Drive, Suite 615, Redwood City, California 94065. Ocera common stock is traded on the NASDAQ under the ticker symbol "OCRX." Defendant Ocera and the Individual Defendants are referred to herein as "Defendants."

18. Defendant MEH Acquisition Co. is a Delaware corporation and direct wholly-owned subsidiary of MAK LLC, and is a party to the Merger Agreement. Defendant MEH Acquisition Co.

is named as a defendant herein solely for the purpose of providing full and complete relief.

19. Defendant MAK LLC is a Delaware limited liability company and an indirect wholly-owned subsidiary of Mallinckrodt plc, and is a party to the Merger Agreement. MAK LLC is named as a defendant herein solely for the purpose of providing full and complete relief.

20. Defendant Mallinckrodt plc is an Irish public limited company, and is a party to the Merger Agreement. Mallinckrodt plc is named as a defendant herein solely for the purpose of providing full and complete relief.

## FURTHER SUBSTANTIVE ALLEGATIONS

**COMPANY BACKGROUND**

21. Ocera is a clinical stage biopharmaceutical company focused on the development and commercialization of novel therapeutics for orphan and other serious liver diseases with high unmet medical need. The Company is focused on the development and commercialization of OCR-002 (ornithine phenylacetate) in both intravenous ("IV") and oral formulations. OCR-002 is an ammonia scavenger and has been granted orphan drug designation and Fast Track status by the U.S. Food and Drug Administration for the treatment of hyperammonemia and resultant hepatic encephalopathy ("HE") in patients with acute liver failure and acute-on-chronic liver disease.

**THE SALE PROCESS TRANSACTION**

22. In 2017, regulatory uncertainty surrounding the development pathway for OCR-002 and the significant operational and capital structure changes necessary to continue to advance the development of OCR-002 into late-stage clinical trials, stirred Ocera to commence discussions with a number of potential strategic partners regarding their respective interest in a strategic transaction.

23. These efforts, which were rooted in the approximately 50 separate in-person meetings that Ocera held at the JPM Healthcare Conference in January 2017 (the "JPM Conference") with institutional investors as well as large pharmaceutical companies, including Mallinckrodt, and other biopharmaceutical companies, including a private biopharmaceutical company ("Party A"), resulted in a number of pharmaceutical and biopharmaceutical companies expressing their interest in executing a confidentiality agreement with Ocera to facilitate further discussions.

24. On January 20, 2017, Ocera executed confidentiality agreements with Party A and an

affiliate of Mallinckrodt to facilitate sharing of confidential information between the parties in an effort to allow for continued discussion of a potential collaboration, partnership, or other strategic transaction. Neither of the two confidentiality agreements contained a standstill provision.

25. During a March 16, 2017 regularly scheduled meeting of the Ocera Board, the Board determined that it would be appropriate for Ocera to retain a financial advisor to assist the Board in its evaluation of strategic alternatives available to Ocera, including interest from Mallinckrodt, Party A, and others to date, and manage a strategic review process, including contacting more parties beyond those that had expressed initial interest, in an effort to increase competition and enhance stockholder value. To further assist in this process, the Board determined to create a special committee (the "Strategic Committee") consisting of Defendants Weber, VanLent, and James to oversee the strategic exploration process and the engagement of a financial advisor, and, in between meetings of the full Board, to give direction to management, Ocera's financial and legal advisors, and to lead on behalf of Ocera any negotiations with potentially interested parties.

26. On April 4, 2017, Party A sent Ocera a preliminary non-binding term sheet outlining a stock-for-stock combination via a "reverse merger" transaction. The proposal, which would have left existing Ocera stockholders with as little as 20% of the combined company's stock, was viewed unfavorably by the Board and the Strategic Committee, and management was directed to communicate to Party A that Ocera did not find the proposal attractive.

27. Three days later, on April 7, 2017, the Strategic Committee determined to engage MTS as Ocera's financial advisor to assist the Board in its evaluation of a business combination transaction and other strategic alternatives. Ocera entered into an engagement letter with MTS on April 19, 2017.

28. MTS went to work almost immediately. From April 25, 2017 to May 1, 2017, MTS contacted 34 potential strategic partners previously identified by the Strategic Committee. Of the 34 companies contacted, 15 elected to execute confidentiality agreement with Ocera, or already had one in place.

29. Throughout the month of May and June, the number of potential strategic partners declined further downward. By June 20, 2017, only seven pharmaceutical and biopharmaceutical

companies were actively conducting due diligence. During this same period of time, the Recommendation Statement indicates that only one company, Mallinckrodt, elected to submit a non-binding letter of intent for an acquisition of Ocera.

30. On May 22, 2017 Mallinckrodt submitted a preliminary non-binding letter of intent for an acquisition of Ocera that contemplated a cash payment $55 million upfront with a total potential consideration of $250 million to $300 million, with the contingent consideration to be paid upon the occurrence of certain unspecified clinical and regulatory milestones with respect to Ocera's clinical development efforts. One month later, following negotiations between Ocera and Mallinckrodt regarding the May 22, 2017 preliminary indication of interest, Mallinckrodt submitted a revised non-binding letter of intent on June 30, 2017, that contemplated a $57 million upfront cash payment with a total potential cash consideration of $604 million. The proposal further requested 45 days of exclusivity and asked for a response by July 14, 2017.

31. Mallinckrodt revised non-binding letter of intent was discussed by the Ocera Board during a July 5, 2017 special meeting. Although the Board concluded that Mallinckrodt's proposal would provide substantial value to Ocera stockholders, the Board elected to continue with the strategic process. To that end, the Board directed MTS to submit bid process letters to the seven remaining biopharmaceutical companies engaged in active due diligence, including Mallinckrodt and Party A, and ask them to submit updated proposals by July 14, 2017.

32. Only two companies, Mallinckrodt and Party A, submitted proposals by the July 14, 2017 deadline. Mallinckrodt's updated proposal included a $65 million upfront cash payment with a total potential cash consideration of $532 million. Mallinckrodt's proposal again requested 45 days of exclusivity and asked for a response by the end of July 2017. Party A's revised proposal consisted of an upfront payment of approximately $39 million in cash with potential contingent cash payments of up to $80 million. Despite the disparity in value between the two offers, Ocera determined to continue negotiating with both Mallinckrodt and Party A.

33. Over the next month both Party A and Mallinckrodt continued to engage in due diligence of Ocera and to negotiate the terms of the merger agreement. From August 28, 2017 through September 4, 2017, MTS requested that Mallinckrodt and Party A submit their "best and

final" offers by September 8, 2017.

34. Mallinckrodt and Party A chose to submit their "best and final" offers on September 8 and September 9, respectively. Interestingly, this time it was Party A that presented the superior proposal. Party A's updated proposal contemplated an upfront cash payment of approximately $43 million and potential contingent payments of up to $111 million. Conversely, Mallinckrodt's "best and final" offer contemplated a $40 million cash upfront payment with up to $15 million in contingent consideration, payable upon certain developmental milestones. In light of Party A's superior offer, Ocera executed a two-week exclusivity letter with Party A to facilitate extensive due diligence of Ocera's business and to further negotiations pertaining to the merger agreement and related documents.

35. Ocera negotiated exclusively with Party A throughout the month of September, but ultimately found itself unable to complete the deal following Party A's decision to withdraw its proposal for the acquisition of Ocera.

36. On October 2, 2017, a special meeting of the Strategic Committee was held, during which the Special Committee discussed Party A's decision to withdraw its acquisition offer, including the risks such withdrawal presented with respect to Ocera actually consummating a transaction after a lengthy process and what it would have meant for Ocera not to have executed a transaction after so many companies performed extensive due diligence. Unwilling to pursue a licensing or similar transaction with Party A, the Special Committee directed MTS to reach out to Mallinckrodt to determine whether Mallinckrodt was willing to improve its offer and move expeditiously towards execution and consummation of an acquisition.

37. The following day, Mallinckrodt confirmed its continued interest and informed MTS that it was willing to improve its offer and move expeditiously towards execution and consummation of an acquisition.

38. Three days later, On October 6, 2017, Mallinckrodt submitted a revised letter of intent to Ocera that contemplated $42 million upfront cash payment, or $1.52 per share, with up to $75 million in contingent cash consideration, payable upon certain developmental and sales milestones. Additionally, the proposal required that Ocera maintain a minimum cash balance of

$3 million at closing, and that Mallinckrodt be granted 45 days of exclusivity.

39.     From October 6, 2017 through October 24, 2017, Mallinckrodt continued extensive due diligence on Ocera, and on October 24, 2017, Mallinckrodt indicated its desire to structure the acquisition as a tender offer followed by a second-step merger.

40.     From October 24, 2017 through October 31, 2017, Ocera and Mallinckrodt, and their respective representatives, negotiated the definitive terms for the Offer and the merger, including the Merger Agreement, CVR Agreement, and Tender and Support Agreement, and on November 1, 2017, the parties reached an agreement regarding the terms of the Merger Agreement. Later that day, the Board met to vote on the proposed acquisition and, following the presentation of MTS's fairness opinion, the Board proceeded to approve the Merger Agreement and the Transaction. That same night, the Company, Mallinckrodt, Parent, and Purchaser finalized and executed the Merger Agreement and other definitive documents for the Transactions, and the following day, November 2, 2017, the parties issued a joint press release announcing the merger.

**THE PROPOSED TRANSACTION**

41.     In a press release dated November 2, 2017, Ocera announced that it had entered into a Merger Agreement with Mallinckrodt pursuant to which Mallinckrodt will commence a Tender Offer to acquire all of the outstanding shares of Ocera for $1.52 per share (approximately $42 million), plus one Contingent Value Right to receive one or more payments in cash of up to $2.58 per share (up to approximately $75 million) based on the successful completion of certain development and sales milestones.

42.     The press release states in pertinent part:

**STAINES-UPON-THAMES, United Kingdom, and REDWOOD CITY, CA, Nov. 2, 2017** Mallinckrodt plc (NYSE: MNK), a leading global specialty pharmaceutical company, and Ocera Therapeutics, Inc. (NASDAQ: OCRX), today announced that they have entered into an agreement under which Mallinckrodt will acquire Ocera, a clinical stage biopharmaceutical company focused on the development and commercialization of novel therapeutics for orphan and other serious liver diseases with high unmet medical need. Ocera's developmental product OCR-002, an ammonia scavenger, is being studied for treatment of hepatic encephalopathy, a neuropsychiatric syndrome associated with hyperammonemia, a complication of acute or chronic liver disease. OCR-002 is a Phase 2 asset with both intravenous (IV) and oral formulations. Despite inability to meet statistical significance in its primary endpoint, Ocera's Phase 2 STOP-HE trial achieved secondary endpoints that revealed differentiated clinical impact, including demonstrated effect on lowering serum ammonia levels. Mallinckrodt believes that

trial design elements, in part, drove the primary outcome and, on acquisition, will invest to establish the optimal dosing regimen prior to initiating a Phase 3 program. Mallinckrodt will have continued engagement with the U.S. Food and Drug Administration (FDA) to confirm the regulatory pathway to gain FDA approval and subsequently launch the IV formulation, expected by 2022, and the oral formulation, expected by 2024.

The FDA granted OCR-002 its Orphan Drug Designation, and the resulting seven years' exclusivity would be applied upon first approval of the drug. The FDA also granted its Fast Track designation, a process designed to facilitate development and expedite the review of drugs to treat serious conditions and fill an unmet medical need. The European Medicines Agency (EMA) also granted Orphan Drug status to OCR-002. If approved, the drug will have substantial durability through its Orphan Drug status and additionally through intellectual property that extends to at least 2030.

"Hepatic encephalopathy can be a debilitating condition, affecting brain function and, in some cases, resulting in coma or death," said **Steven Romano, M.D., Chief Scientific Officer and Executive Vice President of Mallinckrodt.** "We look forward to bringing this much-needed treatment option to patients who suffer from this condition."

"We believe OCR-002 has the potential to help thousands of patients whose hepatic encephalopathy is insufficiently treated by current therapies," said **Linda S. Grais, M.D., President and Chief Executive Officer, Ocera**. "We're excited by the additional development capability and commercial reach that can be gained by becoming part of Mallinckrodt. With this focus, I'm confident this important treatment can be successfully brought to market."

**Understanding Hepatic Encephalopathy**

Roughly 30 to 35 million U.S. patients have chronic liver disease, which can develop into liver cirrhosis in some cases, a condition where the liver becomes damaged and irreversibly scarred. Cirrhosis can be brought on by a wide range of underlying causes such as nonalcoholic steatohepatitis, or fatty liver disease; alcohol use; hepatitis; autoimmune diseases; diabetes; and obesity. Approximately 5.5 million patients in the U.S. have liver cirrhosis.

Cirrhosis impedes the liver's ability to remove toxins from the body, including ammonia. **Hepatic encephalopathy** (HE) is a critical neuropsychiatric condition resulting from hyperammonemia (excess ammonia in the blood).While many patients who develop HE will have cirrhosis, incidents of HE are also reported in patients with other types of liver disease such as acute liver failure or bypass shunts. Progression of HE is measured through neurocognitive symptoms, including personality changes, disorientation, stupor and, in severe cases, coma or death.

Acute HE is usually initially diagnosed in the emergency department, and treated by a hepatologist or gastroenterologist; outside the hospital, HE is largely treated by gastroenterologists. Hospitalized HE patients with other underlying triggers or conditions, e.g., gastrointestinal bleeding or infection, will be sent to the intensive care unit (ICU). Severe acute HE patients will also likely be sent to the ICU. The typical length of overall hospital stay for an acute HE episode is five to seven days, though it may be longer for patients with concomitant conditions. Many acute HE patients have a recurrence and will be readmitted to the hospital with subsequent acute HE episodes.

**OCR-002 Eliminates Ammonia from Bloodstream through Novel Method of Action**

Although the STOP-HE study did not meet its primary endpoint, it achieved secondary endpoints that validated OCR-002 as a potent ammonia scavenger, leading to significant reduction in circulating ammonia (p=0.017). In a subsequent, post-hoc analysis of the data, it was observed that the degree of ammonia reduction in patients correlated strongly with clinical improvement. As the response rate also appeared to increase proportionally to dose level, this suggests that some patients in the Phase 2 trial may have been under-dosed.

Treatment with OCR-002 rapidly eliminates ammonia in the bloodstream, excreting it through the kidneys, a more effective and less burdensome method of addressing HE than existing treatment options. Those alternatives include lactulose, a laxative that frequently causes severe diarrhea, and Rifaximin, an antibiotic indicated only for reduction of recurrent HE, which can cause broad gastrointestinal issues and is restricted for patients with severe liver issues.

OCR-002's active ingredients are ornithine and phenylacetic acid (PAA). The unique method of action includes:

- Ornithine contributes to glutamate, which combines with ammonia to create glutamine, a carrier of ammonia that "pushes" ammonia through the body.

- PAA combines with glutamine to form phenylacetylglutamine, "pulling" ammonia into the urine and excreting it through the kidneys.

The IV formulation of OCR-002, if approved, is expected to provide rapid reduction in symptoms of acute HE, and potentially reduce hospitalization stay. A subset of patients continues to have HE symptoms after discharge. OCR-002's oral formulation, if approved, is expected to provide post-discharge continuity of care for the HE patient, reducing the risk of recurrent HE episodes and rehospitalization. It is also anticipated that patients may transition from the IV to the oral formulation prior to discharge from the hospital setting.

"We believe OCR-002 has the potential to significantly alter the treatment paradigm for patients suffering from this serious condition," said **Mark Trudeau, Chief Executive Officer and President of Mallinckrodt**. "The addition of this highly durable, unique developmental asset to our portfolio is an excellent example of Mallinckrodt's strategic vision as a patient-centric, innovation driven specialty pharmaceutical growth company focusing on severe and critical conditions."

**Hepatic Encephalopathy Market**

Approximately 200,000 U.S. patients are hospitalized with acute HE annually. Acute HE patients' average hospital stay is five to seven days, at an average cost of $30,000 to $60,000 per stay. There is a 40 to 50 percent recurrence rate and potential rehospitalization within the first year of an acute event, with the likelihood of recurrence increasing with severity. Only 50 to 60% of high-risk patients are receiving current standard of care and fewer stay on therapy due to poor compliance.

The U.S. potential market opportunity is estimated at $5 to $7 billion, with $2 to $3 billion in acute treatment and $3 to $4 billion for recurrent incidents. Approximately 1.5 to 2 million patients are at risk of HE. As noted, no intravenous FDA-approved therapy exists for the treatment of acute HE.

Ocera holds worldwide rights to OCR-002, and Mallinckrodt estimates the market for HE patients in Europe and Japan to be in the range of 150,000 to 200,000 annually. Mallinckrodt will assess regulatory pathways for approvals in markets outside the U.S. post-acquisition.

**Commercialization**

If approved, Mallinckrodt expects OCR-002 to be commercialized by the company's existing sales organizations. At launch, patient access to this unique treatment option would also be supported and enhanced by the company's strong relationships with hospital networks, insurance companies and group purchasing organizations. Mallinckrodt's existing infrastructure of clinical and medical affairs experts will also support approval and launch of both formulations of the product. Mallinckrodt will work with the Ocera development team to ensure smooth integration of the development and regulatory plan.

**Financial Considerations and Closing**

A subsidiary of Mallinckrodt will commence a cash tender offer to purchase all of the outstanding shares of Ocera Therapeutics common stock for $1.52 per share (approximately $42 million), plus one Contingent Value Right to receive one or more payments in cash of up to $2.58 per share (up to approximately $75 million) based on the successful completion of certain development and sales milestones.

Mallinckrodt expects dilution from the acquisition to adjusted diluted earnings per share by $0.25 to $0.35 annually beginning in 2018, assuming the expected 2017 close. Guidance on the impact of the acquisition to the company's GAAP diluted earnings per share has not been provided due to the inherent difficulty of forecasting the timing or amount of items that would be included in calculating such impact. Subject to customary closing conditions, the company estimates the transaction will close in the fourth quarter of 2017.

**THE RECOMMENDATION STATEMENT MISLEADS OCERA STOCKHOLDERS BY OMITTING MATERIAL INFORMATION**

43.     As noted previously, on November 9, 2017, the Company filed the Recommendation Statement with the SEC in support of the Tender Offer commenced by Mallinckrodt. As alleged below and elsewhere herein, the Recommendation Statement contains material misrepresentations and omissions of fact that must be cured to allow Ocera's stockholders to make an informed decision regarding tendering their shares. Designed to convince stockholders to tender their shares, the Recommendation Statement is rendered misleading by the omission of critical information concerning Ocera's Prospective Financial Information and the valuation analyses performed by Ocera's financial advisor. This material information directly impacts the Company's expected future value as a standalone entity, and its omission renders the statements made materially misleading and, if disclosed, would significantly alter the total mix of information available to

Ocera's stockholders.

### MATERIAL OMISSIONS CONCERNING OCERA'S PROSPECTIVE FINANCIAL INFORMATION

44. Specifically, the Recommendation Statement omits to disclose critical information concerning the financial projections for the Company that were relied upon by the Board in recommending the Proposed Transaction. This omitted information, if disclosed, would significantly alter the total mix of information available to Ocera's stockholders that they would rely upon in deciding whether to tender their share.

45. Here, the Recommendation Statement provides projected values for EBIT and Unlevered Free Cash Flow for projected financial information over the years 2017-2030. Although the Recommendation Statement describes the various adjustments that were made to these non-GAAP measures and how they were calculated, it omits to disclose the line item projections for the calculations, and fails to reconcile these non-GAAP projections to the most comparable GAAP measures.

46. Providing these non-GAAP metrics without fully disclosing the line item metrics used to calculate them, or otherwise reconciling the non-GAAP projection to GAAP measures, makes the provided disclosures materially incomplete and misleading. Non-GAAP measures have no universally understood definition and vary widely between companies depending on the needs of management in promoting their own effect on Company performance. Rather than disclose the information necessary to reconcile these measures, Defendants chose to omit this information.

47. Consequently, the Recommendation Statement provides Ocera stockholders a number of non-GAAP financial projections that make it extremely difficult for stockholders to assess the fairness of the Proposed Transaction. This is particularly problematic for Ocera stockholders because the Board relied on these non-GAAP metrics in determining to enter into the Merger, and their incomplete disclosure is inherently misleading.

48. The omission of this information renders certain portions of the Recommendation Statement false and/or materially misleading in contravention of the Exchange Act including, inter alia, the following sections of the Recommendation Statement: (i) "Opinion of the Company's

Financial Advisor"; and (ii) "Certain Prospective Financial Information about Ocera Provided to Mallinckrodt, the Company's Financial Advisor and the Board."

### *Material Omissions Concerning MTS's Financial Analyses*

49. The Recommendation Statement describes MTS's fairness opinion and the various valuation analyses it performed in support of its opinions. However, the description of MTS's fairness opinion and the underlying analyses omits key inputs and assumptions underlying these analyses. Without this information, as described below, Ocera public stockholders are being misled as to what weight, if any, to place on MTS's fairness opinions in determining whether to tender their shares. This omitted information, if disclosed, would significantly alter the total mix of information available to Ocera stockholders.

50. Specifically, with regard to MTS's *Discounted Cash Flow Analysis*, the Recommendation Statement omits to disclose: (i) the line item projections underlying the Company's projected unlevered free cash flows for years 2017 through 2030, including taxes, depreciation and amortization expenses, change in net working capital, and capital expenditures; (ii) the actual inputs and assumptions underlying the discount rate range of 18% to 22% used by MTS in its analysis; and (iii) the implied values of the Company without the application of the "probability of commercial success" factor provided by Company management.

51. With respect to MTS's *Publicly Traded Comparable Companies Analysis*, the Recommendation Statement provides values relating to the Stock Price, Market Capitalization, and Enterprise Value for each company included in the analysis but omits to disclose the trading multiples MTS observed for each company included in the analysis.

52. Similarly, with regard to MTS's *Selected Acquisitions Analysis*, the Recommendation Statement again omits to disclose the trading multiples MTS observed for each transaction included in the analysis.

53. Accordingly, with respect to both MTS's *Publicly Traded Comparable Companies Analysis* and MTS's *Selected Acquisitions Analysis*, it is unclear as to whether MTS simply reviewed certain numeric values of the selected companies and transactions, or if the financial advisor correctly performed a comparable analysis by calculating trading multiples. Accordingly, Ocera

must either disclose the trading multiples or, if no trading multiples were calculated, disclose MTS's reason for failing to do so.

54. When a bankers' endorsement of the fairness of a transaction is touted to stockholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses are crucial to a fair presentation of the material facts. Furthermore, the disclosure of projected financial information provides stockholders with the best basis to project the future financial performance of a company, and allows stockholders to understand the financial analyses performed by the company's financial advisor in support of its fairness opinion. This information is therefore material, and must be disclosed if Ocera stockholders are to make a fully informed decision. The omission of this information renders the statements made concerning the financial advisors' analyses and opinions materially misleading.

55. Without such undisclosed information, Ocera stockholders cannot evaluate for themselves whether the financial analyses performed by MTS were based on reliable inputs and assumptions or whether they were prepared with an eye toward ensuring that a positive fairness opinion could be rendered in connection with the Proposed Transaction. In other words, full disclosure of the omissions identified above is required in order to ensure that stockholders can evaluate the extent to which MTS's opinion and analyses should factor into their decision whether to tender their shares or pursue their appraisal rights.

56. The omission of this information renders certain portions of the Recommendation Statement false and/or materially misleading in contravention of the Exchange Act including, inter alia, the following sections of the Recommendation Statement: (i) "Opinion of the Company's Financial Advisor"; and (ii) "Certain Prospective Financial Information about Ocera Provided to Mallinckrodt, the Company's Financial Advisor and the Board."

57. Without disclosure of the above referenced information, the Recommendation Statement violates SEC regulations and materially misleads Ocera stockholders.

58. Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company stockholders will continue to suffer absent judicial intervention.

# CLAIMS FOR RELIEF

## COUNT I

### Claims Against All Defendants for

### Violations of Section 14(e) of the Securities Exchange Act

59. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

60. Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading . . . ." 15 U.S.C. § 78n(e).

61. As discussed above, Ocera filed and delivered the Recommendation Statement to its stockholders, which Defendants knew or recklessly disregarded contained material omissions and misstatements as set forth above.

62. Defendants violated Section 14(e) of the Exchange Act by issuing the Recommendation Statement in which they made untrue statements of material facts or failed to state all material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, in connection with the tender offer commenced in conjunction with the Proposed Transaction. Defendants knew or recklessly disregarded that the Recommendation Statement failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

63. The Recommendation Statement was prepared, reviewed, and/or disseminated by Defendants. It misrepresented and/or omitted material facts, in connection with the merger as set forth above.

64. In so doing, Defendants made untrue statements of material facts and omitted material facts necessary to make the statements that were made not misleading in violation of Section 14(e) of the Exchange Act. By virtue of their positions within the Company and/or roles in the process and in the preparation of the Recommendation Statement, Defendants were aware of this information and their obligation to disclose this information in the Recommendation Statement.

65. The omissions and incomplete and misleading statements in the Recommendation

Statement are material in that a reasonable stockholder would consider them important in deciding whether to tender their shares or seek appraisal. In addition, a reasonable investor would view the information identified above which has been omitted from the Recommendation Statement as altering the "total mix" of information made available to stockholders.

66. Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Recommendation Statement, causing certain statements therein to be materially incomplete and therefore misleading. Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Proposed Transaction, they allowed it to be omitted from the Recommendation Statement, rendering certain portions of the Recommendation Statement materially incomplete and therefore misleading.

67. The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff, and Plaintiff will be deprived of their entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the expiration of the tender offer.

## COUNT II

### Claims Against All Defendants for

**Violations of Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 (17 C.F.R. § 240.14d-9)**

68. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

69. Defendants have caused the Recommendation Statement to be issued with the intention of soliciting stockholder support of the Proposed Transaction.

70. Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 promulgated thereunder require full and complete disclosure in connection with tender offers.

71. The Recommendation Statement violates Section 14(d)(4) and Rule 14d-9 because it omits material facts, including those set forth above, which render the Recommendation Statement false and/or misleading.

72. Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Recommendation Statement, causing certain statements therein to be materially incomplete and therefore misleading. Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the

16   Case No. 3:17-cv-06687
COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

Proposed Transaction, they allowed it to be omitted from the Recommendation Statement, rendering certain portions of the Recommendation Statement materially incomplete and therefore misleading.

73. The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff, and Plaintiff will be deprived of their entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the expiration of the tender offer.

74. The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff, and Plaintiff will be deprived of their entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the expiration of the tender offer.

## COUNT III

### Against the Individual Defendants for

### Violations of Section 20(a) of the Exchange Act

75. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

76. The Individual Defendants acted as controlling persons of Ocera within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Ocera and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Recommendation Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

77. Each of the Individual Defendants was provided with or had unlimited access to copies of the Recommendation Statement alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

78. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same. The Recommendation Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. They were thus

directly involved in the making of the Recommendation Statement.

79. By virtue of the foregoing, the Individual Defendants violated Section 20(a) of the Exchange Act.

80. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(d) of the Exchange Act and Rule 14d-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' conduct, Plaintiff is threatened with irreparable harm.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants jointly and severally, as follows:

(A) declaring that the Recommendation Statement is materially false or misleading;

(B) enjoining, preliminarily and permanently, the Proposed Transaction;

(C) in the event that the transaction is consummated before the entry of this Court's final judgment, rescinding it or awarding Plaintiff rescissory damages;

(D) directing that Defendants account to Plaintiff for all damages caused by them and account for all profits and any special benefits obtained as a result of their breaches of their fiduciary duties;

(E) awarding Plaintiff the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

(F) granting Plaintiff such further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: November 20, 2017          **LEVI & KORSINSKY, LLP**

By: /s/ *Rosemary M. Rivas*
Rosemary M. Rivas
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: (415) 291-2420
Facsimile: (415) 484-1294

Donald J. Enright (to be admitted *pro hac vice*)
Elizabeth K. Tripodi (to be admitted *pro hac vice*)
**LEVI & KORSINSKY, LLP**
1101 30th Street NW, Suite 115
Washington, DC 20007
Tel: (202) 524-4290
Fax: (202) 337-1567
Email: denright@zlk.com

*Counsel for Plaintiff SAMUEL P. CLARKE*