Rosemary M. Rivas (State Bar No. 209147)
Email: rrivas@zlk.com
**LEVI & KORSINSKY, LLP**
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: (415) 291-2420
Facsimile: (415) 484-1294

*Counsel for Co-Lead Plaintiff Samuel P. Clark and Co-Lead Counsel for the Putative Class*

[*Additional Counsel listed on signature block.*]

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| IN RE OCERA THERAPEUTICS, INC. SECURITIES LITIGATION | Lead Case No. 3:17-cv-06687- RS<br><br>**CLASS ACTION**<br><br>**CONSOLIDATED COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>**JURY TRIAL DEMANDED** |
|---|---|

Lead Plaintiffs Samuel P. Clarke and William Paulus ("Plaintiffs"), on behalf of themselves and the proposed Class defined herein, bring this class action for violations of Sections 14(e) and 20(a) of the Securities Exchange Act of 1934. In support of this Consolidated Complaint, Plaintiffs, by their attorneys, allege upon information and belief, except for their own acts, which are alleged on knowledge, as follows:

**NATURE OF THE ACTION**

1. Plaintiffs seek to recover damages for all former similarly situated public stockholders of Ocera Therapeutics, Inc. ("Ocera" or the "Company") for violations of Section 14(e) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78n(e) and 78t(a), by Ocera's former board of directors (collectively, the "Board" or the "Individual Defendants") in connection with the sale of all of the outstanding shares of Ocera to entities affiliated with Mallinckrodt plc ("Mallinckrodt") via a tender offer.

2. Ocera is a clinical stage biopharmaceutical company focused on the development and commercialization of OCR-002 (ornithine phenylacetate) in both intravenous ("IV") and oral formulations. OCR-002 is an ammonia scavenger and has been granted Orphan Drug designation and Fast Track status by the U.S. Food and Drug Administration ("FDA") for the treatment of hyperammonemia and resultant hepatic encephalopathy ("HE") in patients with acute liver failure and acute-on-chronic liver disease.

3. On November 2, 2017, Ocera announced that it had entered into a definitive merger agreement (the "Merger Agreement") pursuant to which Mallinckrodt would commence a tender offer (the "Tender Offer") to acquire all of the outstanding shares of Ocera common stock for $1.52 per share (the "Cash Consideration") plus one contingent value right per share ("CVR") representing the contractual right to receive one or more payments in cash estimated to be up to $2.58 in the aggregate, contingent upon the achievement of certain milestones (the "Contingent Consideration" and, collectively with the Cash Consideration, the "Merger Consideration"). The Contingent Consideration is contingent upon three milestones; the first two milestones are tied to the successful commencement of Phase 3 clinical trials for OCR-002, and the third milestone is tied to reaching over $500,000,000 in sales for OCR-002.

4. The Tender Offer commenced on November 9, 2017, and expired on December 8, 2017. More than 50% of Ocera's common shares were validly tendered in the Tender Offer. As a result of the Tender Offer and resulting merger, Ocera became an indirect, wholly owned subsidiary of Mallinckrodt (the "Transaction"). Accordingly, Ocera's former stockholders have received the Cash Consideration of $1.52 per Ocera share they owned, and the maximum potential Merger Consideration they stand to receive is $4.10 per share, which they will only receive if all three milestones are achieved and the maximum CVR cash payment of $2.58 is issued.

5. The Merger Consideration was inadequate and undervalued the Ocera shares held by Plaintiffs and the Class. To properly value the then-present-value of the Merger Consideration at the time the Transaction was announced, the implied value of the Contingent Consideration needs to be discounted because of its contingent nature. The Recommendation Statement notes that Ocera's financial advisor valued the then-present value of the aggregate Merger Consideration (*i.e.*, the Cash Consideration of $1.52 plus the then-present value of the CVR Contingent Consideration) at $1.99 per share. Recommendation Statement at 34. However, analysts had set price targets for Ocera shares above that value shortly before the consummation of the Transaction, including a target of $3.00 per share issued by Aegis Capital on May 24, 2017. According to marketbeat.com, the consensus price target for Ocera between September 2017 and December 2017 ranged from $4.50 to $2.67 per share[1]. In other words, as a result of the Tender Offer and Transaction, which could not have been completed without the misleading Recommendation Statement (discussed in detail below), Plaintiffs and the Class suffered economic loss in that they did not receive fair consideration for their Ocera shares, which were worth more than the Merger Consideration.

6. In connection with the commencement of the Tender Offer, on November 9, 2017, Defendants caused a Recommendation Statement on Schedule 14D-9 (the "Recommendation Statement" or "RS") to be filed with the SEC and disseminated to Ocera stockholders. The Recommendation Statement was materially deficient and misleading because, *inter alia*, it failed to disclose two sets of Ocera projections that were approved by the Board and reviewed by the

---

[1] *See* Ocera Therapeutics Stock Price, Price Target & More, available at https://www.marketbeat.com/stocks/NASDAQ/OCRX/ (last accessed April 26, 2018).

Company's financial advisor, MTS Health Partners, L.P. (collectively with its affiliate MTS Securities LLC, "MTS"). The set of projections ultimately relied upon by MTS in rendering its fairness opinion was approved, apparently, on the same day that the Merger Agreement was signed. *See* RS at 38 ("The tables below present selected elements of the Projections, as prepared by the Company's management and provided to and approved by the Board on November 1, 2017 and as provided to MTS for its use and reliance in connection with its financial analyses and opinion to the Board . . ."). While the Recommendation Statement discloses this set of projections, RS at 40, it provides no basis for how or why these projections were created, and more importantly, how they differ from the previous projections.

7. Based on the facts as disclosed in the Recommendation Statement, it appears that the Company revised its projections downward twice in order to make the deal with Mallinckrodt seem appealing. Indeed, the first downward revision was not based on management's opinion, but rather on "feedback from potential partners," RS at 21, presumably input from bidders such as Mallinckrodt whose sole goal was to acquire Ocera for the lowest price possible. Without disclosure of the initial, unbiased management projections that were approved by the Board on June 20, 2017 (defined below as the June Projections), Ocera stockholders were deprived of the projections that actually represented Ocera management's best estimates regarding the Company's future financial performance, and they were impeded from recognizing the extent to which the Board modified its financial projections downward after receiving pressure from bidders to do so.

8. Indeed, publicly available information from various other sources outside the Recommendation Statement contradicts or undercuts the reasons that Ocera stockholders were told purportedly supported the downward revision to Ocera's projections between June and August of 2017. Those reasons were described in general terms in an Amendment No. 2 to the Recommendation Statement that Ocera caused to be filed with the SEC on December 1, 2017 (the "Supplemental Disclosures").[2] As set forth below, the reasons set forth in the Supplemental Disclosures did not actually support a downward revision to the Company's June Projections, which were management's

[2] Schedule 14D-9 Amendment No. 2, Ocera Therapeutics, Inc., Dec. 1, 2017, available at https://www.sec.gov/Archives/edgar/data/1274644/000119312517358942/d281363dsc14d9a.htm

pure, unadulterated best estimates of the Company's future prospects prepared before receiving input and "feedback" from outside parties. Accordingly, it appears that the June Projections that were omitted from the Recommendation Statement were, in fact, the projections that most accurately reflected Ocera management's best estimates and judgments regarding the future financial performance of the Company. Nevertheless, the Recommendation Statement falsely or misleadingly portrayed the downward revised projections that were relied upon by MTS in connection with preparing its fairness opinion as the projections that reflected Ocera management's best estimates and judgments of the Company's future financial performance. RS at 30.

9. Ocera stockholders relied upon the materially incomplete and misleading Recommendation Statement in determining whether to tender their shares in favor of the Transaction. As a result, stockholders agreed to a Tender Offer that substantially undervalued their shares.

10. For these reasons and as set forth in detail herein, Defendants have violated Sections 14(e) and 20(a) of the Exchange Act. Accordingly, Plaintiffs seek to recover damages resulting from Defendants' violations of the Exchange Act.

**JURISDICTION AND VENUE**

11. The claims asserted herein arise under Sections 14(e) and 20(a) of the Exchange Act. The Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

12. The Court has personal jurisdiction over each of the Defendants because each conducts business in and maintains operations in this District or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

13. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as pursuant to 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Ocera maintains its principal place of business in this District and each of the Individual Defendants, and Company officers or directors, either resides in this District or has extensive contacts within this District; (iii) a substantial portion of the transactions and wrongs

complained of herein occurred in this District; (iv) most of the relevant documents pertaining to Plaintiffs' claims are stored (electronically and otherwise), and evidence exists, in this District; and (v) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

14. Plaintiffs were, at all relevant times, the owners of shares of Ocera common stock.

15. Defendant Eckard Weber ("Weber") served as Chairman of the Board of Ocera since 2013.

16. Defendant Linda S. Grais ("Grais") served as President and Chief Executive Officer ("CEO") and a director of the Company since 2013.

17. Defendant Wendell Wierenga ("Wierenga") served as a director of the Company since 2013.

18. Defendant Steven P. James ("James") served as a director of the Company since 2014.

19. Defendant Nina Kjellson ("Kjellson") served as a director of the Company since 2013.

20. Defendant Anne M. VanLent ("VanLent") served as a director of the Company 2011.

21. Defendant Willard H. Dere ("Dere") was elected to serve as a director of the Company on October 26, 2016.

22. Defendants Dere, VanLent, Kjellson, James, Weirenga, Grais, and Weber are collectively referred to herein as the "Board" or the "Individual Defendants."

23. Defendant Ocera is a corporation organized and existing under the laws of the State of Delaware. The Company maintains its principal executive offices at 555 Twin Dolphin Drive, Suite 615, Redwood City, California 94065. Ocera common stock was traded on the NASDAQ under the ticker symbol "OCRX." As a result of the Transaction, Ocera is now a wholly-owned subsidiary of MAK LLC, a Delaware limited liability company and an indirect wholly-owned subsidiary of Mallinckrodt plc. Ocera and the Individual Defendants are referred to collectively as the "Defendants."

## CLASS ACTION ALLEGATIONS

24. Plaintiffs bring this action as a class action on behalf of all former holders of Ocera

stock who were harmed by Defendants' actions described herein (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to, controlled by, or affiliated with, any Defendant, including the immediate family members of the Individual Defendants.

25.    This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23.

26.    The Class is so numerous that joinder of all members is impracticable.  According to the Recommendation Statement, as of November 1, 2017, there were 26,514,134 Ocera common shares issued and outstanding.  These shares were held by hundreds to thousands of beneficial holders who are geographically dispersed across the country.

27.    There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.  The common questions include, *inter alia*, the following:

   a.    whether Defendants violated Sections 14(e) and 20 of the Exchange Act in connection with the Transaction; and

   b.    whether Plaintiffs and the other members of the Class suffered damages as a result of the Transaction and Defendants' violations of law.

28.    Plaintiffs' claims are typical of the claims of the other members of the Class and Plaintiffs do not have any interests adverse to the Class.

29.    Plaintiffs are adequate representatives of the Class, have retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

30.    The prosecution of separate actions by individual members of the Class creates a risk of inconsistent or varying adjudications with respect to individual members of the Class, which could establish incompatible standards of conduct for Defendants.

31.    Plaintiffs anticipate that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

32.    Defendants acted on grounds generally applicable to the Class with respect to the

matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class a whole.

33. Accordingly, Plaintiffs seek to recover damages resulting from Defendants' violations of the Exchange Act.

## FURTHER SUBSTANTIVE ALLEGATIONS

34. Ocera is a clinical stage biopharmaceutical company focused on the development and commercialization of novel therapeutics for orphan and other serious liver diseases with high unmet medical need. The Company is focused on the development and commercialization of OCR-002 (ornithine phenylacetate) in both IV and oral formulations. OCR-002 is an ammonia scavenger and has been granted orphan drug designation and Fast Track status by the FDA for the treatment of hyperammonemia and resultant hepatic encephalopathy in patients with acute liver failure and acute-on-chronic liver disease.

### A. The Process Leading to the Transaction and the Company's Revisions to Its Projections

35. In 2017, Ocera commenced discussions with a number of potential strategic partners regarding their respective interest in a strategic transaction.

36. These efforts, which were rooted in the approximately 50 separate in-person meetings that Ocera held at the JPM Healthcare Conference in January 2017 (the "JPM Conference") with institutional investors as well as large pharmaceutical companies, including Mallinckrodt, and other biopharmaceutical companies, including a private biopharmaceutical company ("Party A"), resulted in a number of pharmaceutical and biopharmaceutical companies expressing their interest in executing a confidentiality agreement with Ocera to facilitate further discussions.

37. On January 20, 2017, Ocera executed confidentiality agreements with Party A and an affiliate of Mallinckrodt to facilitate sharing of confidential information between the parties in an effort to allow for continued discussion of a potential collaboration, partnership, or other strategic transaction.

38. During a March 16, 2017 regularly scheduled meeting of the Ocera Board, the Board determined that it would be appropriate for Ocera to retain a financial advisor to assist the Board in its evaluation of strategic alternatives available to Ocera, including interest from Mallinckrodt, Party A,

and others, and to manage a strategic review process. To further assist in this process, the Board created a special committee (the "Strategic Committee") consisting of Defendants Weber, VanLent, and James to oversee the strategic exploration process and the engagement of a financial advisor, and, in between meetings of the full Board, to give direction to management, Ocera's financial and legal advisors, and to lead on behalf of Ocera any negotiations with potentially interested parties.

39. On April 4, 2017, Party A sent Ocera a preliminary non-binding term sheet outlining a stock-for-stock combination via a "reverse merger" transaction. The proposal, which would have left existing Ocera stockholders with as little as 20% of the combined company's stock, was viewed unfavorably by the Board and the Strategic Committee, and management was directed to communicate to Party A that Ocera did not find the proposal attractive.

40. Three days later, on April 7, 2017, the Strategic Committee determined to engage MTS as Ocera's financial advisor to assist the Board in its evaluation of a business combination transaction and other strategic alternatives. Ocera entered into an engagement letter with MTS on April 19, 2017. Pursuant to the engagement agreement, MTS received a retainer of $75,000, an opinion fee of $500,000 upon the delivery of its fairness opinion, and an aggregate transaction fee of approximately $1.35 million upon the consummation of the Transaction (against which the retainer and opinion fee were credited).

41. From April 25, 2017 to May 1, 2017, MTS contacted 34 potential strategic partners previously identified by the Strategic Committee. Of the 34 companies contacted, 15 elected to execute confidentiality agreement with Ocera, or already had one in place.

42. As of June 20, 2017, seven pharmaceutical and biopharmaceutical companies were actively conducting due diligence.

43. On May 22, 2017, Mallinckrodt submitted a preliminary non-binding letter of intent for an acquisition of Ocera that contemplated a cash payment of $55 million upfront with a total potential consideration of $250 million to $300 million, with the contingent consideration to be paid upon the occurrence of certain unspecified clinical and regulatory milestones with respect to Ocera's clinical development efforts.

44. On June 20, 2017, Ocera held its regularly scheduled annual meeting of stockholders

and second quarter Board meeting, at which management and MTS were present. **At this meeting, the Board approved management's projections of Ocera as a standalone company (the "June Projections"**).

45. One month later, following negotiations between Ocera and Mallinckrodt regarding the May 22, 2017 preliminary indication of interest, Mallinckrodt submitted a revised non-binding letter of intent on June 30, 2017, that contemplated a $57 million upfront cash payment with a total potential cash consideration of $604 million. The proposal further requested 45 days of exclusivity and asked for a response by July 14, 2017.

46. Mallinckrodt's revised non-binding letter of intent was discussed by the Ocera Board during a July 5, 2017 special meeting. The June Projections were presumably considered and/or utilized by MTS in connection with the financial analyses it presented to the Board during the July 5, 2017 Board meeting. During that meeting, MTS presented the recent Mallinckrodt proposal in detail and, among other financial analyses, described the net present value implied by Mallinckrodt's proposal. The Board expressed its belief that the revised proposal Mallinckrodt had submitted as of that date would provide substantial value to Ocera stockholders, and discussed how best to further enhance stockholder value through the next phase of the strategic process. In order to conclude that the offer "provide[d] substantial value to Ocera stockholders," the Board presumably needed to consider the June Projections. The Board directed MTS to submit bid process letters to the seven remaining biopharmaceutical companies engaged in active due diligence, including Mallinckrodt and Party A, and ask them to submit updated proposals by July 14, 2017.

47. Mallinckrodt and Party A submitted proposals by the July 14, 2017 deadline. Mallinckrodt's updated proposal included a $65 million upfront cash payment with a total potential cash consideration of $532 million. Mallinckrodt's proposal again requested 45 days of exclusivity and asked for a response by the end of July 2017. Party A's revised proposal consisted of an upfront payment of approximately $39 million in cash with potential contingent cash payments of up to $80 million.

48. On July 18, 2017, Ocera held a special meeting of the Board, in which management and MTS were present, to review the revised proposals from Mallinckrodt and Party A and the status

of discussions with other strategic partners. MTS presented the recent Mallinckrodt and Party A proposals in detail and, among other financial analyses, described the net present value implied by both proposals. The Board and MTS presumably considered the June Projections in connection with the financial analyses and consideration of the proposals discussed at this meeting.

49. Over the next month both Party A and Mallinckrodt continued to engage in due diligence of Ocera and to negotiate the terms of the merger agreement.

50. On August 25, 2017, Mallinckrodt submitted a revised letter of intent to Ocera with a significant reduction in deal economics. The updated proposal included only $45 million in an upfront cash payment without any potential contingent consideration. Mallinckrodt reiterated that the offer was subject to completion of due diligence and that Ocera was expected to have a minimum cash balance of $3 million assuming a closing by September 30, 2017. Mallinckrodt requested 45 days of exclusivity and asked for a response by September 1, 2017. Ocera's and MTS's conversations with Mallinckrodt indicated the reduction was a result of ***Mallinckrodt's*** then current belief, based in part on the results of the pK/pD Study, that the IV formulation of OCR-002 would require another Phase 2 clinical trial to establish the optimal dose before the program could advance to Phase 3 clinical trials.

51. On August 27, 2017, Ocera held a special meeting of the Board to discuss the revised proposals from Mallinckrodt and Party A. The Recommendation Statement states that "[i]n light of the feedback from potential partners, management revised and the Board approved revised financial projections of Ocera as a standalone company prepared by management" (the "August Projections"). RS at 21. The Supplemental Disclosures filed with the SEC revealed that this "feedback" related to:

> [T]he possibility, based in part on the results of the pK/pD Study, that the IV formulation of OCR-002 might require another Phase 2 clinical trial to establish the optimal dose before the program could advance to Phase 3 clinical trials, uncertainty about the potential Phase 3 clinical trial design for the IV formulation of OCR-002, lack of regulatory clarity, mixed views on the market opportunity and potential safety concerns raised by the Phase 2b STOP-HE clinical data.

52. While the Supplemental Disclosures regarding the revisions to the June Projections does not say it explicitly, the clear inference drawn is that management and the Board revised the projections downward. This downward revision to the June Projections previously prepared by management and approved and relied upon by the Board and MTS was in response to *external*

*pressure*. There is no indication that management and the Board believed these downward revisions were necessary, despite the fact that they ultimately approved them.

53. Indeed, the rationale set forth in the Supplemental Disclosure regarding why the Company's projections needed to be "revised" suggest that such a revision was not in fact prompted by changes regarding management's views. The Company's initial management projections (the June Projections) were approved by the Board on June 20, 217. RS at 18. That date was *months after* the results of the Phase 2b STOP-HE study were announced (January 30, 2017), and the June Projections therefore must have accounted for the purported "potential safety concerns raised by the Phase 2b-STOP-HE clinical data." Indeed, based upon the Recommendation Statement and other SEC filings, it appears that Ocera had completed its "post hoc analyses" of the STOP-HE trial before the June Projections were approved by the Board. Specifically, on March 8, 2017, Ocera issued a press release reporting the results of additional post hoc analyses of its Phase 2b STOP-HE clinical trial. These data confirmed OCR-002's ability to lower ammonia among subjects with HE and that ammonia reduction has a statistically significant correlation with clinical improvement.

54. Further, on May 9, 2017, Ocera filed its Quarterly Report on Form 10-Q for the quarter ended March 31, 2017, and issued its earnings release, both of which announced additional ***positive results*** from the post hoc analysis of the Phase 2b STOP-HE clinical data.

55. With respect to the STOP-HE trial, the May 9, 2017 earnings press release stated:

> To date, 2017 has been very eventful for Ocera with a successful Phase 1 study of oral OCR-002 in cirrhotic patients in January followed by the completion of our STOP-HE Phase 2b clinical trial of IV OCR-002 and subsequent data read out," said Linda Grais, M.D., Chief Executive Officer of Ocera. "**The data from STOP-HE confirmed that hyperammonemia is correlated with the severity of HE symptoms and that OCR-002 correlates with faster reduction of ammonia, and with clinical improvement**."
>
> Previously, the company reported top-line data from STOP-HE based on an intent to treat (ITT) population of patients with elevated plasma ammonia levels at screening. Patients receiving OCR-002 demonstrated a 17-hour reduction in time to improvement in HE symptoms over placebo (47 *versus* 64 hours, respectively) for the primary endpoint, p=0.129.
>
> **Today, the company reported new data from STOP-HE. A post-hoc analysis of the same primary endpoint revealed patients with confirmed hyperammonemia at randomization (baseline) <u>improved faster</u> on OCR-002 than placebo (42 *versus* 63 hours, respectively), with statistical significance, p=0.034**.

> The findings are based on a retrospective analysis of baseline ammonia levels drawn at time of randomization and determined by a central laboratory. Of the 231 patients in the ITT analysis, 201 were confirmed as hyperammonemic at time of randomization; some patients' ammonia levels had normalized between screening and randomization under standard of care. This post-hoc per protocol population represents the study's target population given the ammonia-scavenging mechanism of action of OCR-002.
>
> **We are very encouraged by this additional analysis of the data which reaffirms the clinical benefits attributable to the mechanism of action of OCR-002**," said Stan Bukofzer, M.D., Chief Medical Officer. "**STOP-HE demonstrated that rapid reduction of ammonia in hyperammonemic patients leads to faster clinical improvement, which we believe will translate to better outcomes for these patients**. We look forward to continuing to develop OCR-002 with the hope of bringing these benefits to patients, their families, and to the healthcare system."[3]

56. The press release makes no mention of any "safety concerns raised by the Phase 2b STOP-HE clinical data" or any other negative news regarding the post hoc analysis of the STOP-HE data. Further, the description of the post hoc analysis in the press release makes it sound like the analysis was complete. No reference is made to an ongoing "post hoc analysis"; rather, the release **summarizes the findings of the post hoc analysis**, confirms what the STOP-HE study "**demonstrated**," and notes the Company's plan to continue developing OCR-002. The Recommendation Statement notes that May 9, 2017 was "the date the Company presented post-hoc protocol analysis **demonstrating** that IV OCR-002 achieved its primary endpoint in patients with confirmed hyperammonemia with statistical significance," further suggesting that the analysis was complete or virtually complete as of that date. RS at 32.

57. Indeed, in addition to the May 9, 2017 press release, Ocera prepared an investor presentation with slides indicating that the Company's analysis of the STOP-HE trial results was finalized and positive. Such slides included:

[3] Ocera Therapeutics Reports First Quarter 2017 Financial Results and Provides Clinical Update, May 9, 2017, available at https://www.sec.gov/Archives/edgar/data/1274644/000127464417000038/exhibit991oceraearningsrel.htm

Post-hoc Analysis Demonstrates OCR-002 Achieved Primary Endpoint with Statistical Significance
80
60
40
20
0
Hours
42
63
21 hr difference
OCR-002
n=104
Placebo
n=97
n=201
Proportion of Subjects
OCR-002
Placebo
p=0.034
Time to
Clinical Improvement in HE Symptoms
12
ocera

## Wealth of STOP-HE Data Supports Promise of OCR-002

| Primary Endpoint | | |
|---|---|---|
| Clinical improvement with baseline ammonia > ULN* | p=0.034 | ✓ |
| **Ammonia Drives HE and OCR-002 Lowers Ammonia** | | |
| Ammonia reduction correlates with clinical improvement | p=0.0006 | ✓ |
| Level of HE severity correlated with ammonia levels | p=0.032 | ✓ |
| OCR-002 normalizes ammonia faster than SOC | p=0.028 | ✓ |
| **Time to Improvement is Critical Inside Hospital** | | |
| Patients on OCR-002 more likely to respond within 48 hours compared to PBO | p=0.026 | ✓ |
| **OCR-002 Appears to have Positive Benefit/Risk Ratio in an Underserved Patient Population** | | |
| Benefit in time to clinical improvement without rifaximin | p=0.004 | ✓ |
| Improvement in MELD scores | p=0.051 | ✓ |
| Physician Overall Evaluation | p=0.026 | ✓ |
| Improvement in renal function, particularly in patients that started with high BUN levels at baseline | p=0.04 | ✓ |
| Lower frequency of deaths and severe life-threatening AEs at higher doses | | ✓ |

*In ITT population, patients receiving OCR-002 demonstrated a 17-hr reduction in time to improvement of HE symptoms compared to placebo for the primary endpoint, p=0.129

16

ocera

13 Lead Case No. 3:17-cv-06687- RS
CONSOLIDATED COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934



Considerations for Phase 3
Post-hoc analysis confirms efficacy with hyperammonemia and supports proceeding to appropriately designed pivotal
Ammonia as part of primary endpoint; STOP-HE data demonstrate strong correlation between ammonia reduction and clinical improvement
Earlier administration of drug and assessment of clinical improvement
Adjustments to dosing regimen
Evaluating rifaximin use as label:
Not indicated for OHE
Cautions against use in severe liver impairment citing potential for 21-fold increase in systemic exposure in Child-Pugh C patients (70% in the study)
17
ocera

58. Another slide in the presentation, entitled "OCR-002 Addressing Unmet Need in HE" stated that "OCR-002 addresses key desirable product attributes as described by physicians," including "safety and tolerability." Slide 26.

59. Simply stated, no "safety concerns raised by the Phase 2b STOP-HE clinical data" were referenced in the Company's statements regarding the post-hoc analysis of the clinical data, and, to the extent such "concerns" actually existed, they must have been accounted for when the June Projections were approved. Such "concerns" therefore could not support a significant reduction to the June Projections. The Company also reiterated that the data from the STOP-HE trial "***showed that OCR-002 was both safe and well-tolerated at all dose levels evaluated***" in the quarterly reports it

issued on March 14, 2017[4], May 9, 2017[5], August 1, 2017[6], and November 14, 2017[7].

60. Furthermore, the Company's view regarding the "market opportunity" for intravenous and oral OCR-002 ***actually improved after June 2017***. In its November 14, 2017 10-Q, the Company stated:

> Our strategy is to focus clinical development activities on the IV formulation of OCR-002 to treat overt HE in hospitalized patients and on the oral form of OCR-002, which will be directed to chronic care of HE patients. Based on third party analysis of Healthcare Cost and Utilization Project, or HCUP, and Medicare data, we estimate that there are approximately 200,000 patients accounting for approximately 260,000 hospitalizations for overt HE in the United States annually. Additional third-party data from Centers for Medicare and Medicaid Services, or CMS, indicate that approximately 60% of patients suffering from HE are hospitalized for over four days. **Utilizing this incidence data and a combination of third-party information and market research commissioned by us regarding pricing, we believe the combined annual market potential for intravenous and oral OCR-002 is approximately <u>$2.0 to $2.6 billion</u> in the United States alone. If intravenous OCR-002 is able to reduce the time to clinical improvement, and thereby shorten hospital stay, we believe it has an annual market potential of <u>$1.1 billion to $1.4 billion</u> and if the oral formulation can reduce the frequency of overt HE episodes, we believe it has an annual market potential of $900 million to $1.2 billion**.[8]

61. The "market opportunity" referenced in the Company's November 2017 10-Q ***is better*** than the "market opportunity" referenced in the Company's May 9, 2017 10-Q, which stated:

> Our strategy is to focus clinical development activities on the IV formulation of OCR-002 to treat overt HE in hospitalized patients and on the oral form of OCR-002, which will be directed to chronic care of HE patients. Based on third party analysis of Healthcare Cost and Utilization Project, or HCUP, and Medicare data, we estimate that there are approximately 200,000 patients accounting for approximately 260,000 hospitalizations for overt HE in the United States annually. Additional third-party data from Centers for Medicare and Medicaid Services, or CMS, indicate that approximately 60% of patients suffering from HE are hospitalized for over four days. **Utilizing this incidence data and a combination of third-party information and market research commissioned by us regarding pricing, we believe the combined annual market potential for intravenous and oral OCR-002 is approximately <u>$1.5 to $2.0 billion</u> in the United States alone. If intravenous OCR-002 is able to reduce the time to clinical improvement, and thereby shorten hospital stay, we believe it has an annual market potential of <u>$600 to $800 million</u> and if the oral formulation can reduce the frequency of overt HE episodes, we**

---

[4] https://www.sec.gov/Archives/edgar/data/1274644/000127464417000014/ocera10-k2016.htm

[5] https://www.sec.gov/Archives/edgar/data/1274644/000127464417000040/ocera1q-201710q.htm

[6] https://www.sec.gov/Archives/edgar/data/1274644/000127464417000066/ocera2q-201710q.htm

[7] https://www.sec.gov/Archives/edgar/data/1274644/000119312517342745/d462205d10q.htm

[8] Form 10-Q, Ocera Therapeutics, Inc., Nov. 14, 2017, https://www.sec.gov/Archives/edgar/data/1274644/000119312517342745/d462205d10q.htm.

**believe it has an annual market potential of $900 million to $1.2 billion**.[9]

62. In other words, Ocera's own quarterly reports suggest that management's view of OCR-002's "market opportunity" ***significantly improved after the time the June Projections were prepared***. Nevertheless, the Recommendation Statement and Supplemental Disclosure suggested that "the market opportunity" supported a downward revision between the June and August Projections.

63. The other main justification for the revision to the projections, "the results of the pK/pD Study" are inadequately summarized in the Recommendation Statement. The "pK/pD Study" is defined on page 15 of the Recommendation Statement as "a pharmacokinetic/pharmacodynamic modeling study of OCR-002 in an effort to inform potential dosage levels and regimens for a potential Phase 3 clinical program of OCR-002." According to the Recommendation Statement, Ocera "commissioned work on the pK/pD Study" sometime between February 13 and March 3, 2017. *Id*. at 16. On or around July 19, 2017, Mallinckrodt purportedly indicated that it would need additional time to respond to Ocera's latest counterproposal in order to conduct more due diligence, including diligence related to the pK/pD Study . . . ." *Id*. at 20. Then, on or around August 25, 2017, Mallinckrodt indicated that it was reducing its offer as "a result of *Mallinckrodt's then current belief*, based in part on *the results of the pK/pD Study*, that the IV formulation of OCR-002 would require another Phase 2 clinical trial to establish the optimal dose before the program could advance to Phase 3 clinical trials." *Id*. at 21. In other words, the rationale for Mallinckrodt's lower offer, and the downward revision between the June and August Projections, was Mallinckrodt's *own personal* belief, based upon the undisclosed, unsummarized "results" of a study that appears to be referred to solely in the merger-related SEC filings, that Ocera's future prospects were meaningfully worse than they had been a mere two months earlier. Indeed, the term "pK/pD Study" only appears in the Recommendation Statement, Offer Statement, and Supplemental Disclosures.[10] Yet this study and its undisclosed

---

[9] Form 10-Q, Ocera Therapeutics, Inc., May 9, 2017, https://www.sec.gov/Archives/edgar/data/1274644/000127464417000040/ocera1q-201710q.htm

[10] The term "pK/pD Study" also appears in a July 1, 2015 Second Amended and Restated License Agreement, but based upon the date, it could not have been the same pK/pD Study referred to in the Recommendation Statement. *See* https://www.sec.gov/Archives/edgar/data/1274644/000127464416000107/exhibit10110k2015.htm

"results" in August 2017 were purportedly unfavorable enough to warrant a significant reduction in Mallinckrodt's offer and management's projections.

64. Further, it is unclear what "results" could have been obtained by August 2017 from a study that was first commissioned in late February or early March of 2017. Indeed, the Company's clinical trials referenced on the FDA's clinicaltrials.gov website indicate the time from start date to completion date spanned several years. Thus, there does not appear to have been a study commissioned, associated with clinical trials, from which results were obtained during this time.

65. The results of a study that purportedly warranted a drastic reduction in offer price for Ocera and a downward revision to management's projections were clearly material to Ocera's stockholders; however both the results of the pK/pD Study and the pre-study projections (*i.e.*, the June Projections) were omitted from the Recommendation Statement. The omission of information regarding the study results rendered the statement on page 21 of the Recommendation Statement and in the Supplemental Disclosures regarding the pK/pD Study, which created the impression that the study results warranted or supported the downward revision to the Company's projections, misleading; stockholders had no way to assess the veracity of that assertion, and based upon the above-referenced publicly announced information regarding OCR-002 during that time period, a downward revision to the June Projections was not actually warranted and such a revision was not actually consistent with management's best estimates and views regarding the Company's future prospects.

66. Furthermore, the Recommendation Statement depicts the downward revised projections that MTS utilized for its fairness opinion as *Ocera management's "best currently available estimates and judgments . . . of the future results of operations and financial performance of the Company*." RS at 30[11]. That statement is misleading because, as discussed above, the projections utilized by MTS for its fairness opinion were not in fact management's best estimates of the

[11] MTS' Fairness Opinion letter reiterates the same thing, stating in pertinent part: "[**W]ith respect to the Company Projections**, the Company POS and the Projected Contingent Cash Consideration Payment Dates, **we have assumed, <u>with your consent, and based upon discussions with the Company's management,</u> that they have been reasonably prepared in good faith, <u>that the Company Projections reflect the best currently available estimates and judgments of the management of the Company of the future results of operations and financial performance of the Company</u>** . . . ." RS at A-1.

Company's future financial performance. As explained above, Ocera management's best estimates of the Company's future financial performance were set forth in the *unadulterated original June Projections*—the projections Ocera management prepared without input or bias from outside parties and/or Mallinckrodt, whose sole goal was to acquire Ocera as cheaply as possible. Based upon: (i) the above-cited quarterly reports, which indicate that Ocera management's view regarding the market opportunity for OCR-002 *significantly increased after May 2017*; (ii) the fact that the June Projections had to have already accounted for the purported "safety concerns raised by the Phase 2b STOP-HE clinical data" because such data had been analyzed by the time the June Projections were approved and the Company had issued positive news regarding its analysis of STOP-HE and the safety of OCR-002; and (iii) the fact that the purportedly negative "results" of the pK/pD Study were not referenced in a single other non-Merger related SEC filing, it defies logic to believe that the downward revised projections MTS utilized for its fairness opinion that were included on page 40 of the Recommendation Statement were in fact management's "best estimates" of Ocera's future financial performance. Rather, the statement that the disclosed projections were management's best estimates and the disclosed projections themselves were misleading, because the projections were not in fact management's best estimates of the Company's future financial performance.

67. On August 1, 2017, the Company's second quarter 2017 financial results were announced, which *beat* analysts' earnings per share estimates.

68. From August 28, 2017 through September 4, 2017, MTS requested that Mallinckrodt and Party A submit their "best and final" offers by September 8, 2017.

69. Mallinckrodt and Party A chose to submit their "best and final" offers on September 8 and September 9, respectively. Interestingly, this time it was Party A that presented the superior proposal. Party A's updated proposal contemplated an upfront cash payment of approximately $43 million and potential contingent payments of up to $111 million. Conversely, Mallinckrodt's "best and final" offer contemplated a $40 million cash upfront payment with up to $15 million in contingent consideration, payable upon certain developmental milestones. In light of Party A's superior offer, Ocera executed a two-week exclusivity letter with Party A to facilitate extensive due diligence of Ocera's business and to further negotiations pertaining to the merger agreement and

related documents.

70. On September 20, 2017, Ocera held its regularly scheduled third quarter Board meeting, in which management, MTS, and Goodwin were present. MTS reviewed the status of Ocera's ongoing strategic process. According to the Recommendation Statement "MTS presented the latest letters of intent provided by Mallinckrodt on September 8, 2017 and Party A on September 9, 2017 and, among other financial analyses, described the economics of those proposals and reviewed management projections, which previously had been approved by the Board and described in the section entitled '*—Certain Prospective Financial Information about Ocera Provided to Mallinckrodt, the Company's Financial Advisor and the Board*.'" RS at 22.

71. It is entirely unclear what projections were reviewed at this September 20, 2017 meeting. The projections referenced as having been reviewed on September 20, 2017, could not possibly be the projections included in the Recommendation Statement, as the *Certain Prospective Financial Information about Ocera Provided to Mallinckrodt, the Company's Financial Advisor and the Board* were "prepared by the Company's management and provided to and approved by the Board on November 1, 2017." RS at 38.

72. On October 2, 2017, a special meeting of the Strategic Committee was held, during which the Special Committee discussed Party A's decision to withdraw its acquisition offer. The Company was unwilling to pursue a licensing or similar transaction with Party A, and the Special Committee directed MTS to reach out to Mallinckrodt.

73. Three days later, on October 6, 2017, Mallinckrodt submitted a revised letter of intent to Ocera that contemplated $42 million upfront cash payment, or $1.52 per share, with up to $75 million in contingent cash consideration, payable upon certain developmental and sales milestones. Additionally, the proposal required that Ocera maintain a minimum cash balance of $3 million at closing, and that Mallinckrodt be granted 45 days of exclusivity.

74. According to the Recommendation Statement, "on October 6, 2017, Ocera made available to Mallinckrodt, by inclusion in Ocera's online data room, a subset of the financial information contained in the management projections provided to the Board and described in the section entitled '*—Certain Prospective Financial Information about Ocera Provided to Mallinckrodt,*

*the Company's Financial Advisor and the Board*.'" RS at 24.

75. It is entirely unclear what projections were provided to Mallinckrodt on October 6, 2017. The projections referenced as having been provided could not possibly be the projections included in the Recommendation Statement, as the *Certain Prospective Financial Information about Ocera Provided to Mallinckrodt, the Company's Financial Advisor and the Board* were "prepared by the Company's management and provided to and approved by the Board on November 1, 2017." RS at 38.

76. From October 6, 2017 through October 24, 2017, Mallinckrodt continued extensive due diligence on Ocera, and on October 24, 2017, Mallinckrodt indicated its desire to structure the acquisition as a tender offer followed by a second-step merger.

77. From October 24, 2017 through October 31, 2017, Ocera and Mallinckrodt, and their respective representatives, negotiated the definitive terms for the Tender Offer and the merger, including the Merger Agreement, CVR Agreement, and Tender and Support Agreement, and on November 1, 2017, the parties reached an agreement regarding the terms of the Merger Agreement.

78. On November 1, 2017, after the markets closed, the Board held a meeting. The Recommendation Statement states that at that meeting:

> Members of management and representatives of MTS and Goodwin were present. Representatives of Goodwin reviewed the fiduciary duties of the Board in considering a potential sale of the company, led a discussion on the terms of the proposed merger agreement and advised the Board regarding a projected closing timetable should the Board approve the transaction with Mallinckrodt. At the meeting, representatives of MTS presented to the Board MTS's financial analyses and rendered the oral opinion of MTS, subsequently confirmed by delivery of a written opinion of MTS dated November 1, 2017, to the Board to the effect that as of November 1, 2017, and subject to the assumptions made, procedures followed, matters considered and qualifications and limitations set forth in such written opinion, the Offer Price to be received by holders of Ocera stock (other than Parent, Purchaser and their respective affiliates, and holders of Excluded Shares) pursuant to the Transactions was fair, from a financial point of view, to such holders. Representatives of MTS informed the Board that MTS had no conflicts with respect to Mallinckrodt as, among other reasons, it had not performed any services or received compensation from Mallinckrodt or its affiliates in the last two years. After further discussing the advantages and risks of the proposed transaction that are described in the section entitled "*—Reasons for the Recommendations of the Board*," and based on the discussions and deliberations at the November 1, 2017 and prior Board meetings, the Board unanimously: (i) determined that it is in the best interests of Ocera and the stockholders of Ocera, to enter into the Merger Agreement, the Offer and the Merger, (ii) approved and declared advisable the Merger Agreement, the Offer, the Merger and the other transactions contemplated thereby in accordance with the DGCL, (iii) resolved to recommend that the stockholders of Ocera accept the Offer and

> tender their Shares to Mallinckrodt pursuant to the Offer and (iv) resolved that the Merger be effected under Section 251(h) of the DGCL.

RS at 24-25.

79. The Recommendation Statement later provides "Certain Prospective Financial Information about Ocera Provided to Mallinckrodt, the Company's Financial Advisor and the Board." RS at 38-40. In this section, the Recommendation Statement states that the projections provided to stockholders in the Recommendation Statement were "prepared by the Company's management and provided to and approved by the Board on **November 1, 2017** (the same day on which the Board approved the Merger Agreement), and as provided to MTS for its use and reliance in connection with its financial analyses and opinion to the Board . . . ." RS at 38 (the "November Projections").

80. The "Background of the Transaction" section of the Recommendation Statement discussing the November 1, 2017 meeting makes no mention of the Board approving a set of projections on the same day it signed the Merger Agreement. RS at 24-25. Yet MTS's fairness opinion was based on the November Projections, provided to and approved by the Board on November 1, 2017. RS at 38. It does not appear that these projections were provided to bidders in connection with the Transaction.

81. The details regarding how the August Projections were revised to create the November Projections are glaringly absent from the Recommendation Statement and any supplemental disclosures. The only inference that can possibly be drawn from the fact that management and the Board approved another set of projections **on the same day** that they agreed to the Transaction is that the August Projections were revised further downward in order to make the Merger Consideration appear fair. Management and the Board clearly put their thumb on the scale in making last minute revisions to the Company's projections that MTS used as the basis for its fairness opinion. Furthermore, even if the November Projections (*i.e.*, the projections included in the Recommendation Statement on page 40) were substantially similar to the August Projections, those projections and the statement that they were Ocera management's best estimates and judgments regarding the Company's future financial performance was misleading, because the June Projections actually represented management's best estimates before the projections were revised significantly downward for

purported reasons that are inconsistent with other information disseminated by the Company regarding the results of and data from the STOP-HE trial and the expected future market opportunity for OCR-002.

**B. The Materially Misleading Recommendation Statement Prevented Stockholders from Making an Informed Decision and Misled Them Regarding the Fairness of the Transaction**

82. As noted previously, on November 9, 2017, the Company filed the Recommendation Statement with the SEC in support of the Tender Offer commenced by Mallinckrodt. As alleged herein, the Recommendation Statement contained material misrepresentations and omissions of fact that forced Ocera's stockholders to decide whether to tender their shares without adequate information and misled them about the fairness of the Merger Consideration.

83. As discussed herein, the Recommendation Statement omitted the June Projections and the August Projections, both of which were approved by Ocera's management and the Board and were provided to Mallinckrodt and other bidders. The Recommendation Statement is also entirely misleading regarding what projections were utilized by the Board and Mallinckrodt at various times during the process.

84. The Recommendation Statement also failed to provide any information regarding the "results of the pK/pD Study" which purportedly supported a significant reduction in Mallinckrodt's offer and the Company's June Projections. Details regarding such results were material to the Company's stockholders, so they could have at the very least assessed the legitimacy for the downward revisions. The vague reference to these "results" on page 21 of the Recommendation Statement were rendered misleading by the omission of any details regarding such results, as the statement created the false and misleading impression that the "results" warranted a reduction in the Company's projections. In reality, based upon the above-referenced information disseminated by the Company regarding the results of and data from the STOP-HE trial and the expected future market opportunity for OCR-002, the reduction to the June Projections was driven by pressure and influence from other potential transaction partners rather than management's own beliefs regarding the Company's future prospects.

85. First, the Recommendation Statement omitted management's original, unadulterated June Projections. These projections were approved by the Board on June 20, 2017, at the second

quarter Board meeting. The Board approved these June Projections as "management's projections of Ocera as a standalone company." RS at 18.

86. Second, the Recommendation Statement omitted the August Projections. On August 27, 2017, at a special meeting of the Board, "[i]n light of feedback from potential partners, management revised and the Board approved revised financial projections of Ocera as a standalone company prepared by management." RS at 21. The Supplemental Disclosures made after the filing of the Recommendation Statement revealed that this "feedback" related to:

> [T]he possibility, based in part on the results of the pK/pD Study, that the IV formulation of OCR-002 might require another Phase 2 clinical trial to establish the optimal dose before the program could advance to Phase 3 clinical trials, uncertainty about the potential Phase 3 clinical trial design for the IV formulation of OCR-002, lack of regulatory clarity, mixed views on the market opportunity and potential safety concerns raised by the Phase 2b STOP-HE clinical data

87. Not only were the August Projections omitted entirely from the Recommendation Statement, but the Recommendation Statement also misled stockholders regarding the rationale for revising the previous projections (the June Projections) downward in August 2017. There is no indication that management or the Board thought these downward revisions were necessary; to the contrary, other information disseminated by the Company, including information regarding the market opportunity for OCR-002, *only improved between May and November of 2017, by hundreds of millions of dollars*. *See supra* ¶¶ 60-62. While the Board ultimately approved the August Projections, it appears that external pressure from interested bidders caused the downward revision, not input from management or the Board. Given that neither the June Projections nor the August Projections were disclosed, stockholders had no way to independently assess the reasonableness of these revisions (or, as alleged herein, the lack thereof).

88. Third, the Recommendation Statement misled stockholders regarding the actual projections used by MTS in the financial analyses underpinning its fairness opinion. The "Background of the Transactions" section of the Recommendation Statement only discloses the creation of **two sets** of projections by management which were approved by the Board—the June Projections and the August Projections. Yet, in the section of the Recommendation Statement titled, "Certain Prospective Financial Information about Ocera Provided to Mallinckrodt, the Company's Financial Advisor and

the Board," the Recommendation Statement discloses that "[t]he tables below present selected elements of the Projections, as prepared by the Company's management and provided to and approved by the Board ***on November 1, 2017*** and as provided to MTS for its use and reliance in connection with its financial analyses and opinion to the Board as described below under the heading '*—Opinion of the Company's Financial Advisor.*'" RS at 38. This is the **first and only time** in the Recommendation Statement that the November 1, 2017 projections are mentioned. Yet these projections, approved by the Board on the same day the Board signed the Merger Agreement, served as the basis for MTS's financial analyses underpinning its fairness opinion.

89. The Recommendation Statement overtly misled stockholders by discussing two previous iterations of Company projections that were approved by the Board, provided to bidders, and provided to MTS—the June Projections and the August Projections, but omitting disclosure of a second downward revision to the projections resulting in the November Projections—the projections ultimately used by MTS. It appears that Ocera revised its projections down one final time, and the Board approved such revised projections, to make the Merger Consideration offered in the Transaction appear more attractive to Ocera stockholders. Without disclosure of the June Projections and the August Projections, Ocera stockholders were misled regarding the true value of their stock.

90. Furthermore, even if the November Projections (*i.e.*, the projections included in the Recommendation Statement on page 40) were substantially similar to the August Projections, those projections and the statement that they were Ocera management's best estimates and judgments regarding the Company's future financial performance was misleading, because the June Projections actually represented management's best estimates before those projections were revised significantly downward for purported reasons that are inconsistent with other information disseminated by the Company regarding the results of and data from the STOP-HE trial and the expected future market opportunity for OCR-002, *which increased significantly between May and November 2017*.

91. The Recommendation Statement further misled stockholders regarding what projections were utilized for the financial analyses presented to the Board:

(a). On September 20, 2017, Ocera held its regularly scheduled third quarter Board meeting, in which management, MTS and Goodwin were present. MTS

reviewed the status of Ocera's ongoing strategic process. According to the Recommendation Statement "MTS presented the latest letters of intent provided by Mallinckrodt on September 8, 2017 and Party A on September 9, 2017 and, among other financial analyses, described the economics of those proposals **and reviewed management projections, which previously had been approved by the Board and described in the section entitled '—*Certain Prospective Financial Information about Ocera Provided to Mallinckrodt, the Company's Financial Advisor and the Board*.**'" (emphasis added).

(b). These "management projections" that were reviewed by the Board and utilized by MTS at this meeting were not, in fact, projections that "previously had been approved by the Board and described in the section entitled '—*Certain Prospective Financial Information about Ocera Provided to Mallinckrodt, the Company's Financial Advisor and the Board*.'" As described in detail above, the "*Certain Prospective Financial Information about Ocera Provided to Mallinckrodt, the Company's Financial Advisor and the Board"* were projections approved by the Board on November 1, 2017. RS at 38. There is no indication that the November Projections were available on September 20, 2017. Additionally, the Recommendation Statement is clear that the projections disclosed in "*Certain Prospective Financial Information about Ocera Provided to Mallinckrodt, the Company's Financial Advisor and the Board"* **were not approved by the Board until November 1, 2017**.

92. The Recommendation Statement further misled stockholders regarding what projections were provided to Mallinckrodt:

(a). According to the Recommendation Statement, "on October 6, 2017, Ocera made available to Mallinckrodt, by inclusion in Ocera's online data room, a subset of the financial information contained in the management projections provided to the Board and described in the section entitled '—*Certain*

*Prospective Financial Information about Ocera Provided to Mallinckrodt, the Company's Financial Advisor and the Board*.'"

(b). These "management projections" that were provided to Mallinckrodt at this time were not, in fact, projections that "previously had been approved by the Board and described in the section entitled '—*Certain Prospective Financial Information about Ocera Provided to Mallinckrodt, the Company's Financial Advisor and the Board*.'" As described in detail above, the "*Certain Prospective Financial Information about Ocera Provided to Mallinckrodt, the Company's Financial Advisor and the Board"* were projections approved by the Board on November 1, 2017. There is no indication that the November Projections were available on October 6, 2017. Additionally, the Recommendation Statement is clear that the projections disclosed in "*Certain Prospective Financial Information about Ocera Provided to Mallinckrodt, the Company's Financial Advisor and the Board"* **were not approved by the Board until November 1, 2017**.

93. There is no information more material to stockholders in a merger than financial information and projections necessary to assess the purported "fair value" of their shares. Ocera stockholders were entitled to the Board approved previous two iterations of the Company's projections—the June Projections and the August Projections—to make an informed decision regarding the adequacy of the consideration offered in the Tender Offer. Without this material information, Ocera stockholders were precluded from making an informed decision regarding the Tender Offer.

94. The omission of the June Projections, the August Projections, and the "results of the pK/pD Study" rendered the above-referenced statements misleading, including: (i) the unnecessarily and unreasonably downward revised projections included on page 40 of the Recommendation Statement; (ii) the statement that such projections represented Ocera management's best estimates and judgments regarding the Company's future financial performance, RS at 30, and; (iii) the statement on page 21 of the Recommendation Statement that was expanded by the Supplemental Disclosures

that "feedback from potential partners" regarding "the possibility, based in part on the results of the pK/pD Study, that the IV formulation of OCR-002 might require another Phase 2 clinical trial to establish the optimal dose before the program could advance to Phase 3 clinical trials, uncertainty about the potential Phase 3 clinical trial design for the IV formulation of OCR-002, lack of regulatory clarity, mixed views on the market opportunity and potential safety concerns raised by the Phase 2b STOP-HE clinical data" supported a downward revision to the June Projections.

95. As a result of the above-referenced misleading statements and omissions in the Recommendation Statement, Defendants violated Section 14(e) and 20(a) of the Exchange Act.

**CLAIMS FOR RELIEF**

**COUNT I**

**Claims Against All Defendants for**

**Violations of Section 14(e) of the Exchange Act**

96. Plaintiffs repeat and reallege the preceding allegations as if fully set forth herein.

97. Defendants caused the Recommendation Statement to be issued with the intention of soliciting stockholder support of the Transaction.

98. Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading . . . in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation." 15 U.S.C. § 78n(e).

99. Defendants violated this clause of Section 14(e) because they negligently caused or allowed the Recommendation Statement to be disseminated to Ocera stockholders in order to solicit them to tender their shares in the Tender Offer, and the Recommendation Statement contained untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

100. Defendants negligently omitted the material information identified above from the Recommendation Statement or negligently failed to notice that such material information had been omitted from the Recommendation Statement, which caused certain statements therein to be materially

incomplete and therefore misleading. Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Transaction, they allowed it to be omitted from the Recommendation Statement, rendering certain portions of the Recommendation Statement materially incomplete and therefore misleading. As directors and officers of Ocera, the Individual Defendants had a duty to carefully review the Recommendation Statement before it was disseminated to the Company's stockholders to ensure that it did not contain untrue statements of material fact and did not omit material facts. The Individual Defendants were negligent in carrying out their duty.

101. Ocera is imputed with the negligence of the Individual Defendants, who were each directors and/or senior officers of Ocera.

102. As a direct result of Defendants' negligent preparation, review, and dissemination of the false and/or misleading Recommendation Statement, Plaintiffs and the Class were impeded from exercising their right to seek appraisal on a fully informed basis and were induced to tender their shares and accept the inadequate Merger Consideration in connection with the Transaction. The false and/or misleading Recommendation Statement used to solicit the tendering of shares impeded Plaintiffs and the Class from making a fully informed decision regarding the Tender Offer and was an essential link in consummating the Transaction, which deprived them of full and fair value for their Ocera shares. At all times relevant to the dissemination of the materially false and/or misleading Recommendation Statement, Defendants were aware of and/or had access to the true facts concerning the process involved in selling Ocera, the projections for Ocera, and Ocera's true value, which was greater than the Merger Consideration Ocera's stockholders received. Thus, as a direct and proximate result of the dissemination of the false and/or misleading Recommendation Statement Defendants used to obtain stockholder approval of and thereby consummate the Transaction, Plaintiffs and the Class have suffered damage and actual economic losses (*i.e.*, the difference between the price Ocera stockholders received and the true value of their shares at the time of the Transaction) in an amount to be determined at trial.

103. The misrepresentations and omissions in the Recommendation Statement are material in that a reasonable stockholder would have considered them important in deciding whether to tender

their shares in the Tender Offer. In addition, a reasonable investor would view a full and accurate disclosure as having significantly altered the "total mix" of information made available in the Recommendation Statement and in other information reasonably available to stockholders.

**COUNT II**

**Against the Individual Defendants for**

**Violations of Section 20(a) of the Exchange Act**

104. Plaintiffs repeat and reallege the preceding allegations as if fully set forth herein.

105. The Individual Defendants acted as controlling persons of Ocera within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Ocera and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and misleading statements contained in the Recommendation Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading.

106. Each of the Individual Defendants was provided with or had unlimited access to copies of the Recommendation Statement alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

107. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same. The Recommendation Statement contains the unanimous recommendation of the Individual Defendants to approve the Transaction. They were thus directly involved in the making of the Recommendation Statement.

108. By virtue of the foregoing, the Individual Defendants violated Section 20(a) of the Exchange Act.

109. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(e) of the Exchange Act, by

their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' conduct, Plaintiffs and the Class have suffered damage and actual economic losses (*i.e.*, the difference between the price Ocera stockholders received and the true value of their shares at the time of the Transaction) in an amount to be determined at trial.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment against Defendants jointly and severally, as follows:

(A) Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiffs as Class Representatives and their counsel as Class Counsel;

(B) Declaring that the Recommendation Statement was materially false or misleading;

(C) Awarding Plaintiffs and the members of the Class compensatory and/or rescissory damages against Defendants;

(D) Awarding Plaintiffs and the members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other costs;

(E) Awarding extraordinary, equitable, and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, and any appropriate state law remedies; and

(F) Awarding such other relief as this Court may deem just and proper.

/ / /

/ / /

/ / /

**JURY DEMAND**

Plaintiffs demand a trial by jury.

Dated: April 26, 2018

**LEVI & KORSINSKY, LLP**

By: /s/ *Rosemary M. Rivas*
Rosemary M. Rivas
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: (415) 291-2420
Facsimile: (415) 484-1294

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
Miles D. Schreiner
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel: (212) 971-1341
Fax: (212) 202-7880
Email: jmonteverde@monteverdelaw.com
mschreiner@monteverdelaw.com

*Counsel for Plaintiff William Paulus and Co-Lead Counsel for the Putative Class*

**LEVI & KORSINSKY, LLP**
Donald J. Enright
Elizabeth K. Tripodi
1101 30th Street NW, Suite 115
Washington, DC 20007
Tel: (202) 524-4290
Fax: (202) 337-1567f
Email: denright@zlk.com

*Counsel for Plaintiff Samuel P. Clarke and Co-Lead Counsel for the Putative Class*