UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE OCERA THERAPEUTICS,INC.
SECURITIES LITIGATION

Case No.  17-cv-06687-RS

**ORDER GRANTING MOTION TO
DISMISS WITH LEAVE TO AMEND**

## I. INTRODUCTION

This is a securities fraud class action arising out of the acquisition of Ocera Therapeutics, Inc. ("Ocera") by affiliates of Mallinckrodt plc ("Mallinckrodt") via a tender offer in November to December 2017.  Plaintiffs are shareholders of Ocera, and Defendants are Ocera and individual members Ocera's Board of Directors (the "Board").  Plaintiffs aver that Defendants made material misstatements of fact and materially misleading omissions of fact in recommending that Ocera shareholders tender their shares.  Defendants move to dismiss, contending that Plaintiffs' factual allegations in their Complaint are insufficient to state their claims for relief.  For the reasons explained below, Defendants' motion is granted in its entirety with leave to amend.

## II. BACKGROUND[1]

Before the merger with Mallinckrodt PLC ("Mallinckrodt"), Ocera was a publicly-traded,

---

[1] The factual background is based on the averments in the Complaint, which must be taken as true for purposes of this motion, and on documents incorporated by reference in the Complaint.

clinical-stage biopharmaceutical company targeting acute and chronic orphan liver diseases. Ocera focused its business on the development and commercialization of its sole clinical product candidate, OCR-002 (ornithine phenylacetate), a drug for the treatment of acute and chronic hepatic encephalopathy ("HE") in both intravenous ("IV") and oral formulations. Ocera's HE clinical development efforts included a Phase 2b STOP-HE clinical trial ("STOP-HE"), which completed enrollment in late 2016 and evaluated the safety and efficacy of the intravenous ("IV") formulation of OCR-002.

In 2017, Ocera commenced discussions with a number of potential strategic partners regarding their respective interest in a strategic transaction. On January 20, 2017, Ocera executed confidentiality agreements with a private biopharmaceutical company ("Party A") and a Mallinckrodt affiliate to facilitate sharing of confidential information between the parties in an effort to allow for discussions of a potential strategic combination.

Shortly thereafter, on January 30, 2017, Ocera announced the results of its STOP-HE trial. The STOP-HE trial revealed positive trends on clinical improvement, particularly at higher doses of OCR-002. The initial analysis, however, showed that the trial failed to meet its primary endpoint (time to improvement in HE symptoms) and one of its secondary endpoints (median time to complete response in HE). Ocera's stock dropped from $2.20 per share at the time of the confidentiality agreements to $0.60 per share. Around this time, Ocera management authorized the beginning of a pharmacokinetic/pharmacodynamics modeling study of OCR-002 (the "pK/pD Study") in an effort to inform potential dosage levels and regimens for a potential Phase 3 clinical program of OCR-002.

In March 2017, the Board created the Strategic Committee consisting of nonexecutive, independent directors, to oversee the strategic exploration process and the engagement of a financial advisor. The next month, the Strategic Committee determined to engage MTS Health Partners, L.P. (collectively with its affiliate MTS Securities LLC, "MTS") to serve as Ocera's financial advisor to assist the Board in its evaluation of a business combination transaction and other strategic alternatives. MTS contacted 34 potential strategic partners previously identified by

1   the Strategic Committee, of which 15 elected to execute a confidentiality agreement or already had

2   one in place with Ocera.

3          In May 2017, Mallinckrodt submitted a preliminary non-binding letter of intent to acquire

4   Ocera.  The proposal included a cash payment of $55 million upfront culminating in potential

5   consideration of $250 million to $300 million, contingent on consideration to be paid when certain

6   unspecified clinical and regulatory milestones occurred.  The Strategic Committee rejected the

7   proposal, determining that Ocera could secure a better offer.

8          In June 2017, Ocera held its regularly scheduled annual meeting of stockholders as well as

9   its second quarter Board meeting, at which management and MTS were present.  By this time,

10  seven pharmaceutical and biopharmaceutical companies were actively conducting due diligence.

11  At this meeting, the Board approved management's projections of Ocera as a standalone company

12  (the "June Projections").  Although the Board believed that Mallinckrodt's May Proposal was in a

13  range that would provide significant value to Ocera stockholders, the Board directed Ocera and

14  MTS to continue negotiations with Mallinckrodt and Party A and to generate interest from others.

15         Later that month, Mallinckrodt submitted a revised non-binding letter of intent that

16  contemplated a $57 million upfront cash payment with a total potential cash consideration of $604

17  million.  In response, in July 2017, the Board directed MTS to submit bid process letters to the

18  seven remaining companies engaged in active due diligence, including Mallinckrodt and Party A,

19  and ask them to submit updated proposals by July 14, 2017.

20         Only Mallinckrodt and Party A responded by the deadline.  Mallinckrodt's updated non-

21  binding proposal increased the upfront cash payment to $65 million with a total potential cash

22  consideration of $532 million.  Party A's revised proposal included an upfront payment of $39

23  million with potential contingent cash payments of up to $80 million.  The Committee determined

24  that Mallinckrodt's offer was still inadequate, but that MTS should engage directly with

25  Mallinckrodt to negotiate a higher offer.

26         In August 2017, both Mallinckrodt and Party A raised concerns about the data from

27  Ocera's STOP-HE trial.  Specifically, Party A expressed doubt about the potential Phase 3 clinical

28

United States District Court
Northern District of California

trial design for the IV formulation of OCR-002, in light of the failure of Ocera's Phase 2b STOP-HE clinical trial to meet its primary endpoint.  On August 25, 2017, Mallinckrodt submitted a revised letter of intent with a significant reduction in deal economics, due to Mallinckrodt's belief, based in part on the results of a separate study (pK/pD), that the IV formulation of OCR-002 would require another Phase 2 clinical trial to establish the optimal dose before the program could advance to Phase 3 clinical trials.  Mallinckrodt's revised proposal included a $45 million upfront cash payment without any potential contingent consideration.  The Board held a special meeting with management and MTS later that month to discuss Mallinckrodt and Party A's then-current proposals.  According to the Recommendation Statement, "[i]n light of the feedback from potential partners, . . . the Board approved [management's] revised financial projections of Ocera as a standalone company" (the "August Projections").  (Ex. 1 at 21.)  The Board directed MTS to request the bidders to submit "best and final" offers by September 8, 2017.  (Ex. 1 at 21.)

On that date, Mallinckrodt submitted a revised letter of intent which included a $40 million upfront payment with up to $15 million in contingent consideration.  On September 9, 2017, Party A submitted its updated proposal, consisting of a $43 million upfront payment and potential contingent payments of up to $111 million.  Ocera subsequently entered into a two-week exclusivity agreement with Party A, with Ocera's option to extend by an additional week.  After three weeks of due diligence, Party A ultimately withdrew its proposal on October 2, 2017, citing concerns about the market potential for OCR-002, potential future generic competition, and other issues originally communicated in early August.

Shortly thereafter, Mallinckrodt submitted its final proposal, which included a $42 million upfront cash payment, or $1.52 per share, plus up to $75 million in contingent cash consideration (the "October Proposal").  Ocera then made available to Mallinckrodt, by inclusion in Ocera's online data room, a subset of financial information contained in the management projections provided to the Board.  Mallinckrodt continued due diligence on Ocera throughout October.  Negotiations concluded on November 1, 2017, and, after the stock market closed, the Board held a meeting to discuss and approve the agreements.  MTS representatives presented MTS's financial

analyses and rendered an oral opinion, subsequently confirmed by a written opinion of that date, concluding that the offer price pursuant to the agreements was fair, from a financial point of view, to Ocera's stockholders. The Recommendation Statement provides that the projections provided to the stockholders therein were "prepared by the Company's management and provided to and approved by the Board on November 1, 2017 and as provided to MTS for its use and reliance in connection with its financial analyses and opinion to the Board" (the "November Projections"). (Compl. ¶ 79; Ex. 1 at 38.) The Merger Agreement and the other agreements were executed that evening, and on November 2, 2017, Ocera and Mallinckrodt announced the Merger. Shortly afterward, Ocera filed the Schedule 14D-9 Recommendation Statement, providing comprehensive information concerning the Merger.

Shortly after the Merger was announced, three nearly identical lawsuits challenging the Merger were filed in federal court,[2] two of which were consolidated into the current action.[3] On December 1, 2017, Ocera filed an amendment to the Recommendation Statement which, among other things, provided the reasons the Board approved the November Projections:

> Upon further review during the due diligence process and feedback from potential partners regarding various issues—including, without limitation, the possibility, based in part on the results of the pK/pD Study, that the IV formulation of OCR-002 might require another Phase 2 clinical trial to establish the optimal dose before the program could advance to Phase 3 clinical trials, uncertainty about the potential Phase 3 clinical trial design for the IV formulation of OCR-002, lack of regulatory clarity, mixed views on the market opportunity and potential safety concerns raised by the Phase 2b STOP-HE clinical data—management revised and the Board approved revised financial projections of Ocera as a standalone company prepared by management.

(Compl. ¶ 86; Ex. 2 at 2.) The Tender Offer expired on December 8, 2017, at which time more than 50% of Ocera's shares were tendered. Shortly after the Merger closed, the plaintiff in the *Franchi* Action voluntarily dismissed his complaint. (*Franchi* Action Dkt. 11.)

---

[2] *Franchi v. Ocera Therapeutics, Inc., et al.*, No. 3:17-cv-06636-EMC (the "*Franchi* Action"); *Clarke v. Ocera Therapeutics, Inc., et al.*, No. 3:17-cv-06687-RS (the "*Clarke* Action"); and *Paulus v. Ocera Therapeutics, Inc., et al.*, No. 4:17-cv-06876-JSW (the "*Paulus* Action").

[3] The *Clarke* Action and the *Paulus* Action. (Dkt. 24.)

### III. LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While "detailed factual allegations" are not required, a complaint must have sufficient factual allegations to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). This standard asks for "more than a sheer possibility that a defendant has acted unlawfully." *Id.* The determination is a context-specific task requiring the court "to draw on its judicial experience and common sense." *Id.* at 679.

Additionally, fraud claims are subject to a higher standard and the circumstances constituting fraud must be pleaded with particularity. Fed. R. Civ. P. 9(b). "To satisfy Rule 9(b), a pleading must identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about [the purportedly fraudulent] statement, and why it is false." *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (internal quotation marks omitted). Moreover, Plaintiffs must satisfy the additional standards of the Private Securities Litigation Reform Act ("PLSRA"). 15 U.S.C. § 78u–4(b)(1). Unlike Rule 9(b), the PSLRA requires a plaintiff to plead with particularity facts giving rise to a "*strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A) (emphasis added); *see also* Fed. R. Civ. P. 9(b) ("[C]onditions of a person's mind may be alleged generally."). The Ninth Circuit recently found that the level of culpability required for Section 14(e) violations is negligence. *Varjabedian v. Emulex Corp.*, 888 F.3d 399, 401, 408 (9th Cir. 2018). Therefore, Plaintiffs must plead with particularity facts that give rise to a strong inference of negligence. Plaintiffs must also plead with particularity loss causation. *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 165 (2008) (discussing a claim under section 10(b), but explaining that the PSLRA "imposed . . . a loss causation requirement upon 'any private action' arising from the [Securities Exchange Act]." (quoting 15 U.S.C. § 78u–4(b))); *Or. Pub.*

1    *Emps. Ret. Fund v. Apollo Grp. Incorp.*, 774 F.3d 598. 605 (9th Cir. 2014) (discussing a claim

2    under section 10(b), but holding that Rule 9(b) "applies to all elements of a securities fraud action,

3    including loss causation").

4         A motion to dismiss a complaint under Rule 12(b)(6) of the Federal Rules of Civil

5    Procedure tests the legal sufficiency of the claims alleged in the complaint. *See Conservation*

6    *Force v. Salazar*, 646 F.3d 1240, 1241-42 (9th Cir. 2011). Dismissal under Rule 12(b)(6) may be

7    based on either the "lack of a cognizable legal theory" or on "the absence of sufficient facts

8    alleged under a cognizable legal theory." *Id.* at 1242 (internal quotation marks and citation

9    omitted). When evaluating such a motion, the court must accept all material allegations in the

10   complaint as true and construe them in the light most favorable to the non-moving party. *In re*

11   *Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017). "[C]onclusory allegations of

12   law and unwarranted inferences," however, "are insufficient to defeat a motion to dismiss for

13   failure to state a claim." *Caviness v. Horizon Cmty. Learning Ctr., Inc.*, 590 F.3d 806, 812 (9th

14   Cir. 2010) (internal quotation marks and citation omitted).

15        Plaintiffs' main claim is a violation of Section 14(e) of the 1934 Securities Exchange Act,

16   along with a derivative Section 20(a) claims against the individual Defendants. Section 14(e)

17   covers an untrue statement of material fact or omission of fact with respect to a tender offer. 15

18   U.S.C. § 78n(e). Defendants challenge Plaintiffs' claims for failing sufficiently to allege falsity,

19   negligence, and loss causation.

20                                    **IV. DISCUSSION**

21        *A. Threshold Issues*

22        Defendants request that several documents be incorporated by reference in the Complaint

23   or, in the alternative, judicially noticed: (1) Ocera's Recommendation Statement on Schedule 14D-

24   9 filed with the SEC ("Recommendation Statement") (Ex. 1); (2) Amendment No. 2 to Ocera's

25   Recommendation Statement filed with the SEC ("Supplemental Disclosure") (Ex. 2); (3) Ocera's

26   Forms 10-Q filed with the SEC (Exs. 3, 4, 5); (4) Ocera's Form 10-K filed with the SEC (Ex. 6);

27   (5) Ocera's Forms 8-K filed with the SEC (Exs. 7, 8); (6) Marketbeat.com webpage showing

28

United States District Court
Northern District of California

1    analyst ratings for Ocera's stock price and more (Ex. 11); (7) Ocera's May 9, 2017 investor

2    presentation slide deck (Ex. 12); and (8) a transcript of Ocera's May 9, 2017 conference call given

3    in conjunction with the presentation slide deck.  (*See* Hill Decl.)  Additionally, Defendants ask for

4    judicial notice of: (1) Ocera's Form 8-K filed with the SEC on September 29, 2017; (2)

5    Amendment No. 3 to Ocera's Tender Offer Statement filed with the SEC; and (3) a Bloomberg

6    Law table of the daily open, high, low, and closing price of Ocera's stock from April 1, 2011 to

7    December 8, 2017.  (*See id.*)

8         The Ninth Circuit has recently confronted the issue of the overuse of the incorporation by

9    reference and judicial notice doctrines by defendants in securities cases to defeat "what would

10   otherwise constitute adequately stated claims at the pleading stage."  *Khoja v. Orexigen*

11   *Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018).  The court has cautioned that if defendants

12   are permitted to present their own version of the facts at the pleading stage, and district courts

13   accept such facts as true, it would be "near impossible" for even the most aggrieved plaintiff to

14   demonstrate a plausible claim for relief.  *Id.* at 999.  Each doctrine will be addressed in turn.

15        Incorporation by reference is a judicial doctrine that prevents plaintiffs from selecting only

16   portions of documents that support their claims, while omitting portions of those very documents

17   that weaken or doom their claims.  *Id.* at 1002.  Application of the doctrine in a particular case can

18   be tricky.  Generally, a court may assume an incorporated document's contents are true for

19   purposes of a motion to dismiss under Rule 12(b)(6).  *Id.* at 1003.  It is improper, however, to

20   assume the truth of everything in an incorporated document for the sole purpose of disputing facts

21   stated in a well-pleaded complaint.  *Id.*  A defendant may seek to incorporate a document into the

22   complaint if the plaintiff refers extensively to the document or the document forms the basis of the

23   plaintiff's claim.  *Id.* at 1002.  The mere mention of the existence of a document, however, is

24   insufficient to incorporate the contents of a document.  *Id.*  The Ninth Circuit emphasized that the

25   doctrine must not be used as a tool by defendants to "short-circuit the resolution of a well-pleaded

26   claim."  *Id.*

27        Plaintiffs' opposition conflates the incorporation by reference and judicial notice doctrines,

28

United States District Court
Northern District of California

such that their brief focuses solely on Defendants' arguments for judicially noticing these documents. Their failure to address Defendants' arguments for incorporating these documents by reference could operate as a concession, but instead will be considered on the merits.

Plaintiffs contend that the crux of their section 14(e) claims is that the Recommendation Statement was materially false and misleading. Therefore, to accept *all* of its factual assertions as true would be to allow Defendants to turn Plaintiffs' claims on their head. There is disagreement among judges of this Court regarding how to apply the incorporation by reference doctrine when a plaintiff's complaint alleges that documents contain false or misleading statements. *Compare In re SolarCity Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 988 (N.D. Cal. 2017) ("[T]he Court cannot [assume a document's contents to be true] when [p]laintiffs' complaint alleges that these documents contain false or misleading statements. . . . [A]lthough the Court may consider these documents under the incorporation by reference doctrine, the Court does not assume that the documents contain true statements."), *with In re LeapFrog Enter., Inc. Sec. Litig.*, 200 F. Supp. 3d 987, 993 (N.D. Cal. 2016) ("Plaintiffs expressly referred to these exhibits in the [complaint], and relied on them as sources of the allegedly fraudulent statements. . . . [T]he Court [declines] to strike all factual assertions and arguments derived from [these exhibits].").  In refining the incorporation by reference doctrine to prevent defendants from hijacking a plaintiff's complaint, *Khoja* focused on how extensively a plaintiff relies on a document in its complaint, not whether a plaintiff alleged the document contained material misrepresentations or omitted facts. *See Khoja*, 899 F.3d at 1002-03. In light of this new precedent, *In re LeapFrog* is more persuasive than *In re SolarCity*.

Plaintiffs expressly referred to the Recommendation Statement (Ex. 1) and Supplemental Disclosure (Ex. 2) throughout their Complaint: they are what inspired their claims as the sources of the allegedly fraudulent statements. Therefore, they are incorporated by reference. Similarly, the Forms 10-Q (Exs. 3, 4, 5) and the investor presentation slide deck (Ex. 12) are referenced or quoted multiple times in the Complaint to bolster Plaintiffs' allegations that the statements made in the Recommendation Statement and Supplemental Disclosure cannot follow from those made in

the Forms 10-Q and May 9 presentation. These too are incorporated. Ocera's Form 10-K (Ex. 6), Forms 8-K (Exs. 7, 8), Marketbeat.com webpage (Ex. 11), and conference call transcript (Ex. 13), however, are not extensively referenced in the Complaint and therefore do not warrant incorporation, as they are each mentioned only once in the Complaint or not at all.[4]

Judicial notice is appropriate for "adjudicative fact[s]" that are "not subject to reasonable dispute." Fed R. Evid. 201. The Ninth Circuit has cautioned that simply because a document is susceptible to judicial notice "does not mean that every assertion of fact within that document is judicially noticeable for its truth." *Khoja*, 899 F.3d at 999. Defendants move, in the alternative, for Exhibits 6 through 8, 11, and 13 to be judicially noticed if they are not incorporated by reference. Since these exhibits are not necessary to this decision, however, judicial notice is not appropriate. *See id.* at 1005 ("When parties pile on volumes of exhibits to their motion to dismiss, hoping to squeeze some into the complaint, their submissions can become needlessly unwieldy); *In re LeapFrog*, 200 F. Supp. 3d at 992 (declining to take judicial notice of exhibits not necessary to decide the motion). The same is true for Exhibits 9, 10, and 14. Defendants' request for judicial notice of those exhibits is also denied.

### B. Plaintiffs Material Misstatement Claims

Plaintiffs contend that the June Projections were the pure, unadulterated projections Defendants prepared before they were pressured to reduce them for illegitimate reasons by bidders trying to acquire Ocera at a steep discount. Therefore, in Plaintiffs' view, Defendants' statement that the November projections were "reasonably prepared in good faith" and "reflect[ing] the best currently available estimates and judgments" of Ocera's management regarding "the future results of operations and financial performance of the Company," (Ex. 1 at 30), was an untrue statement of opinion. Additionally, Plaintiffs claim that the reasons provided in the Supplemental

---

[4] The Complaint does not discuss the conference call transcript, but the presentation of which the conference call allegedly was a part. Defendants contend that incorporation by reference includes what was discussed in the conference call in addition to the presentation slide deck. Plaintiffs' Complaint, however, focused on the presentation slide deck, not what was said in the conference call. Since the transcript does not affect this decision, it will not be deemed to be incorporated.

1    Disclosure explaining the downward revision of the projections were untrue statements of fact

2    because they did not and actually could not justify the downward revision.  Instead, Plaintiffs

3    assert they were a false or misleading pretext to justify an unjustifiable downward revision.[5]

4        1. Objective Falsity

5        With regard to the Recommendation Statement, Plaintiffs argue that the June Projections

6    must have been management's best estimates regarding future prospects because: (1) Ocera's

7    quarterly reports indicated that the "market opportunity" for OCR-002 significantly increased after

8    May 2017 leaving no need to revise the June Projections; (2) the June Projections must have

9    already accounted for the results of the STOP-HE trial, including the product's safety; and (3) the

10    pK/pD study was not referenced in a non-Merger related SEC filing and therefore could not have

11    justified modifying the June Projections.  Plaintiffs therefore infer that the November Projections

12    were the result of undue influence by outside parties, especially Mallinckrodt.  The Complaint

13    fails to plead the above with particularity.

14        Plaintiffs rely on a selective reading of the quarterly reports to support their theory.  The

15    reports did not refer to "market *opportunity*," as Plaintiffs allege (Compl. ¶ 66.), but to "market

16    *potential*," (Ex. 3 at 16 (emphasis added); Ex. 4 at 16 (emphasis added); Ex. 5 at 22 (emphasis

17    added)).  Indeed, when the reports' entire content is analyzed, Ocera informed shareholders of

18    negative expectations for the future.  While the potential market for serving HE patients may have

19    increased as Plaintiffs assert, Ocera repeated in these quarterly reports that the drug's ability to

20    serve this market was amorphous, at best.  Each quarterly report reiterated that the company had a

21    "limited operating history" and that the sales and income potential of Ocera's business and market

22    were "unproven."  (Ex. 3 at 7; Ex. 4 at 7; Ex. 5 at 8.)  Every quarter Ocera warned shareholders

23    that the company's ability to continue financing OCR-002's development past the second quarter

24    of 2018 "depend[ed] heavily on the value investors see in the data from previous clinical trials of

25    _____

26    [5] Cases dealing with claims under section 14(a), regarding material misstatements or omissions of
fact in the shareholder proxy vote context, are instructive in section 14(e) tender offer cases when

27    they conduct similar falsity analyses.

28

United States District Court
Northern District of California

1    OCR-002 . . . ."  (Ex. 3 at 7; Ex. 4 at 7; Ex. 5 at 8.)  Perhaps most important, each Form 10-Q

2    cautioned shareholders that the STOP-HE trial failed to meet the primary endpoint, and as a result

3    there were "numerous risks and uncertainties associated with the development and

4    commercialization of OCR-002," including the company's inability to estimate the amount of

5    capital necessary even to continue OCR-002's development.  (Ex. 3 at 19; Ex. 4 at 19; Ex. 5 at

6    28.)  The potential market that could have been served may have changed between May and

7    November 2017, but the uncertainty surrounding OCR-002's development and Ocera's struggling

8    financial situation did not.

9         Plaintiffs' reliance on positive statements regarding the STOP-HE trial similarly fails to

10   provide the full picture.  Even taking Plaintiffs characterization that all STOP-HE analyses were

11   finalized and none had indicated any safety concerns, that still fails to account for the most

12   important fact of the trial—it had failed to meet its primary endpoint.  This prevented OCR-002

13   from proceeding further along the regulatory path to FDA approval and thus commercialization.

14   As stated above, every quarterly report reiterated this failure and the resultant uncertainty

15   regarding OCR-002's development and commercialization.  (Ex. 3 at 19; Ex. 4 at 19; Ex. 5 at 28.)

16   Both the May earnings press release and investor slide presentation explained that statistically

17   significant clinical improvement was confined to patients *with confirmed hyperammonemia at*

18   *baseline*.  (Compl. ¶¶ 55-58; Ex. 12 at 11.)

19        Although Plaintiffs may argue that the June Projections must have accounted for this

20   failure, the company had repeatedly warned shareholders that its ability to continue financing

21   OCR-002's development past the second quarter of 2018 "depend[ed] heavily on the value

22   *investors* see in the data from previous clinical trials of OCR-002 . . . ."  (Ex. 3 at 7 (emphasis

23   added); Ex. 4 at 7 (emphasis added); Ex. 5 at 8 (emphasis added).)  When the June Projections

24   were approved, there were seven companies performing active due diligence on Ocera.  By the

25   time the August Projections were approved, all but two had rejected a strategic partnership with

26   Ocera.  When the November Projections were approved, Party A rejected a deal with Ocera, even

27   after conducting several weeks of due diligence under an exclusivity agreement.  This suggests the

28

United States District Court
Northern District of California

1   reasonable inference that the majority of interested investors did not see Ocera as valuable an

2   investment during the later stages of due diligence than at the earlier stages.

3       Indeed, as the Recommendation Statement explained after Party A withdrew following

4   extensive due diligence under an exclusivity agreement: "The Special Committee discussed Party

5   A's withdrawal of its acquisition offer, including the risks such withdrawal presented with respect

6   to Ocera actually consummating a transaction after a lengthy process and what it would have

7   meant for Ocera not to have executed a transaction after so many companies performed extensive

8   due diligence.  The Special Committee did not believe that starting from the beginning . . . was in

9   the best interest of Ocera's stockholders."  (Ex. 1 at 23.)  Plaintiffs do not allege facts asserting

10  either that the Defendants were wrong to conclude that OCR-002's continued development

11  depended upon the value *investors* saw in the data from OCR-002's clinical trials, or that it was

12  unreasonable for Defendants to revise projections in light of diminishing investor interest.  The

13  June Projections did not and could not account for the withdrawal of the majority of potential

14  bidders after conducting their own due diligence.  The lack of willingness to purchase Ocera in

15  light of the STOP-HE trial's failure to meet its primary endpoint justified revising the company's

16  projections.

17      Plaintiffs' assertion that the pK/pD Study results could not have justified a revision of the

18  June Projections because the results were not referenced in any non-Merger related SEC filing

19  likewise misses the mark.  The pK/pD Study was meant to inform dosage levels and regimens for

20  a potential Phase 3 clinical program of OCR-002.  As multiple quarterly reports stated to

21  shareholders, however, OCR-002 was still in the Phase-2b stage of development, as the STOP-HE

22  trial was unable to meet its primary endpoint.  Furthermore, these quarterly reports informed

23  shareholders that OCR-002's continued development depended heavily on how investors valued

24  data from clinical trials of the drug, including "*favorable* results from any future clinical trials . . .

25  ."  (Ex. 3 at 7 (emphasis added); Ex. 4 at 7 (emphasis added); Ex. 5 at 8 (emphasis added).)  The

26  Recommendation Statement informed shareholders that Mallinckrodt reduced its offer in light of

27  presumably unfavorable pK/pD Study results, which Mallinckrodt concluded would require

28

United States District Court
Northern District of California

another Phase 2 clinical trial to establish optimal dosage before the IV formulation of OCR-002 could advance to Phase 3 clinical trials.  Plaintiffs again do not allege facts asserting either that the Defendants were wrong to conclude that OCR-002's continued development depended upon the value *investors* saw in the data from OCR-002's clinical trials, or that it was unreasonable for Defendants to revise projections in light of diminishing investor interest.  Plaintiffs' charge that this was merely Mallinckrodt's "personal belief," (Compl. ¶ 63), is irrelevant: shareholders were informed Defendants believed that how investors valued OCR-002's clinical trial data was key to the future development of the drug.  The Defendants were justified in taking into account Mallinckrodt's wariness regarding the pK/pD Study results.

With regard to the Supplemental Disclosure, the Complaint fails to show how the reasons provided for the revised projections were false.  Specifically, Plaintiffs fail to address the most important two: that (i) regulatory uncertainty or (ii) uncertainty about the Phase 3 clinical trial design could not have justified revised projections.  As explained above, Plaintiffs have not accounted for the elephant in their Complaint.  The STOP-HE trial failed to meet its primary endpoint, casting doubt on the drug's ability to proceed with Phase 3 clinical trials, let alone securing regulatory approval or achieving commercialization.  Numerous potential bidders withdrew from negotiations after performing due diligence on Ocera, citing these concerns among others.  Since Plaintiffs fail to address these key reasons behind Defendants' decision to revise the projections, it is not necessary to decide Plaintiffs' objections to the other reasons proffered in the Supplemental Disclosure.

Plaintiffs' argument boils down to the premise that the November Projections could not have been the Board's best estimates, because the Board rejected a higher offer from Mallinckrodt after the June Projections were approved.  Plaintiffs, however, fail to plead particular facts to give rise to a claim under PSLRA.  With regard to Mallinckrodt's May, June, and July Proposals, they were all contingent on completion of due diligence.  By August, both Mallinckrodt and Party A had proceeded with due diligence, and expressed concerns regarding if and when the IV formulation of OCR-002 could advance to Phase 3 clinical trials.  Party A ultimately backed out of

the negotiations, while Mallinckrodt submitted a reduced bid.  Plaintiffs again aver no facts to explain why Defendants were wrong in concluding that OCR-002's future development was tied to how investors valued the drug's clinical trials data, let alone why they were precluded from considering feedback from multiple potential acquirers who uncovered risks in the course of due diligence.

Even accepting Plaintiffs' assertion that Ocera's price target between September 2017 and December 2017 ranged from $2.67 to $4.50 per share, the Merger Agreement and CVR Agreement offered a maximum potential offer price of $4.10 per share—a price within Plaintiffs' estimates.  Plaintiffs also do not allege with sufficient particularity why the $1.52 per share upfront offer price, representing a premium of approximately 52% to Ocera's closing price of $1.00 on November 1, 2017, was inadequate.[6]  Plaintiffs have failed to plead sufficiently the Recommendation Statement's assertion that the disclosed November Projections were Defendants' "best currently available estimates and judgments . . . of the future results of operations and financial performance of the Company" or the reasons proffered by the Supplemental Disclosure for the revised projections were objectively false.

2. Subjective Falsity

Plaintiffs also fail to plead any facts showing Defendants did not subjectively believe the November Projections more accurately reflected Ocera's future performance than prior projections.  This was an arm's-length transaction led by a Strategic Committee consisting of three nonexecutive, independent directors.  A financial advisor was hired to assist the Board in its evaluation of a transaction.  The Special Committee oversaw a several-months-long process that involved outreach to 34 potential strategic partners, multiple rounds of due diligence, 15 confidentiality agreements, and at least one exclusivity agreement.[7]  The Strategic Committee met

---

[6] Plaintiffs only offer conclusory statements as to why the implied value of the contingent consideration must be discounted, saying simply that because it is contingent it therefore must be discounted.  Conclusory averments need not be accepted as true.

[7] It is unclear from the Recommendation Statement whether an exclusivity agreement was executed with Mallinckrodt in October 2017.

United States District Court
Northern District of California

1    18 times between March and November 2017, in addition to 10 Board meetings held during that

2    period.  The Complaint avers no conflicts of interest or improper motivation on the part of the

3    Board, the Strategic Committee, or Ocera Management that would impair their judgment.  Nor do

4    Plaintiffs aver any facts showing that the June or August Projections had their reliability

5    confirmed by Ocera's performance or that the Board otherwise knew or should have known that

6    the November Projections were unreliable.  There is nothing in the Complaint reasonably to infer

7    that the transaction was the result of a rushed, biased process.

8         Throughout their Complaint, Plaintiffs assert that the Board essentially caved into

9    "pressure" from outside parties, namely Mallinckrodt, to revise the projections downward in order

10   to justify Mallinckrodt's allegedly undervalued bid.  The Complaint, however, does not contain

11   anything approaching particularized facts reasonably to infer coercion.  Plaintiffs do not aver

12   threats made to the Defendants, or any action taken by Mallinckrodt to influence unduly Ocera's

13   deliberation process or to engage in a hostile takeover.  Instead, Mallinckrodt revised its offer after

14   the due diligence process revealed numerous concerns that had also been reiterated to Ocera

15   stockholders in the company's quarterly reports.  Similarly, when the due diligence process

16   revealed numerous concerns by several potential bidders inspiring all but one to withdraw from

17   negotiations, the Defendants revised the projections.  There is nothing in the Complaint to suggest

18   that any representations in the Recommendation Statement were subjectively false.

19        *C. Plaintiffs Materially Misleading Omissions Claims*

20        Plaintiffs argue that the June and August Projections should have been included in the

21   Recommendation Statement, because they would have illustrated the inadequacy of

22   Mallinckrodt's Merger consideration.  Their omission, in Plaintiffs' opinion, caused the disclosed

23   November Projections to provide a misleadingly incomplete valuation picture of the company's

24   future financial prospects.  Plaintiffs make similar arguments regarding the omission of the pK/pD

25   Study results, details of which Plaintiffs believed were material to stockholders so they could

26   assess the legitimacy for the downward revisions, and the lack of clarity regarding what

27   projections were used during certain specific instances.

28

16

To support a claim for a material omission under Section 14(e), "an omission must be misleading; in other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002); *see also TSC Indus. v. Northway*, 426 U.S. 438, 449 (1976) (defining the "general standard of materiality" in the Rule 14a-9 proxy statement context as "[a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote").  As the Ninth Circuit instructed the district court on remand in *Varjabedian*, the plaintiff "must plead a highly unreasonable omission," involving "not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care," and "which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Varjabedian*, 888 F.3d at 408 (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009)).

Plaintiffs have failed sufficiently to plead a materially misleading omission for any of the sources that they identified.  Since Plaintiffs have failed to aver why the June or August Projections were objectively superior to the November Projections, the omission of these projections from the Recommendation Statement would not have created a false impression about Ocera's financial future.  *See In re Tangoe, Inc. Stockholders Litig.*, No. 3:17-cv-00832, 2018 WL 3651334, at *21 (D. Conn. July 31, 2018) (dismissing a claim based on the omission of earlier projections because the plaintiffs failed to "establish[] that either the [disclosures] omitted material information that a reasonable shareholder would have considered in deciding whether to tender shares").  Indeed, Plaintiffs do not allege that the Defendants relied on any other projection besides the November Projection in deciding to recommend the Merger, thereby failing to explain why prior projections would be relevant for shareholders to consider.  Moreover, Plaintiffs contradict themselves by arguing that the August Projections were an invalid revision of the June Projections—much in the same way they characterize the November Projections—and then asserting that the omission of the August Projections from the Recommendation Statement misled

shareholders.  (*Compare* Compl. ¶ 52, *with* Compl. ¶¶ 86-87.)  Plaintiffs cannot hedge their claims in this manner: information presumably cannot both be materially misleading and its absence a material omission at the same time.

Likewise, Plaintiffs cannot on the one hand aver that the pK/pD Study results were not material enough to warrant revising the June Projections, and then claim that the omission of the results was "clearly material" and should not have been omitted.  (*Compare* Compl. ¶¶ 63-64, 66, *with* Compl. ¶¶ 65, 84, 94.)  In any event, as previously discussed, shareholders were informed Defendants believed that how investors valued OCR-002's clinical trial data was key to the future development of the drug.  Defendants further informed shareholders regarding the STOP-HE trial's failure to meet its primary endpoint and Mallinckrodt's wariness regarding the pK/pD Study results.  Plaintiffs do not adequately aver why the shareholders needed to know the details about the pK/pD Study results in addition to the foregoing information.  Instead, the Complaint appears to demand completeness, which Section 14(e) does not require.  *Brody*, 280 F.3d at 1006.  As the Ninth Circuit explained, "[n]o matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not. . . .  We conclude that . . . Section 14(e) [does not] contain[] a freestanding completeness requirement[.]"  *Id.*  In order to state a claim under the PSLRA, the Plaintiffs' complaint must specify the reason or reasons *why* the statements made by Defendants were misleading or untrue, not simply why the statements were incomplete.  *Id.*; *see also Hussey*, 2017 WL 679500, at *2 ("[A]n incomplete picture does not necessarily establish that the 14D-9 is false or misleading.  The question is whether and how the disclosed projections in the 14D-9 were rendered false or misleading because of the incomplete information.").

Plaintiffs also contend it is unclear which projections were considered in the Board's September 20, 2017 meeting or were provided to Mallinckrodt on October 6, 2017, as the Recommendation Statement states the November Projections were used without clarifying if they were available before November 1, 2017.  (Compl. ¶¶ 71, 75, 83, 91-92.)  Taking Plaintiffs allegations as true, this still does not demonstrate how the Recommendation Statement was

misleading without details regarding which projections were used in these instances.  Plaintiffs have not alleged why the shareholders were entitled to know which projections were used in these instances any more than they were entitled to know the June and August Projections.  There is nothing in the Complaint to suggest their relevance let alone their materiality.  The Recommendation Statement disclosed the most recent set of projections that existed when the Merger was announced and that the Defendants relied upon it in making their recommendation.  Instead, the Complaint again appears to demand completeness, which Section 14(e) does not require.  *Brody*, 280 F.3d at 1006.

### D. Section 14(e) Negligence

For many of the same reasons Plaintiffs have failed adequately to plead subjective falsity, the Complaint lacks sufficient facts giving rise to a strong inference of negligence.  To state a claim under Section 14(e) and to satisfy the PSLRA, Plaintiffs must state with particularity facts giving rise to a "strong inference" that the Defendants acted with negligence.  § 78u-4(b)(2)(A); *Varjabedian*, 888 F.3d at 408.  Contrary to Plaintiffs' argument, there is nothing in the Ninth Circuit's *Varjabedian* opinion to suggest that the negligence inquiry "collapses into the materiality inquiry."  (Opp. at 12, n.3.)  Such a conclusion would make Section 78u-4(b)(2)(A) of the PSLRA surplusage.

The Complaint contains only conclusory averments of Defendants' negligence *as a group*, such as "Defendants had a duty to carefully review the Recommendation Statement before it was disseminated to the Company's stockholders to ensure that it did not contain untrue statements of material fact and did not omit material facts."  (Compl. ¶ 100; *see also* Compl. ¶ 99.)  The Complaint, however, does not contain specific facts regarding *how each* Defendant was negligent in carrying out his or her duties.  The PSLRA requires Plaintiffs to plead particular facts giving rise to a strong inference that *each* Defendant acted with the required state of mind, not as a group.

Beyond this deficiency, there are no facts alleging Defendants failed to review certain materials, or were neglecting their responsibilities, or designed and oversaw a flawed review process.  Indeed, as already discussed, the timeline acknowledged in the Complaint reflects the

United States District Court
Northern District of California

Merger resulted from an extensive and thorough review process that was not rushed, biased, or conflicted.  Plaintiffs infer that the November Projections must have been invalid or part of a flawed process because they appear to have been approved the same day the Merger Agreement was executed.  Accepting that fact, it remains not enough on its own to infer negligence.  The November Projections were the latest after a several-months-long process, with numerous negotiations, several rounds of due diligence, and at least two prior projections (the June and August Projections).  It is reasonable that the Defendants would not need an extensive amount of time to prepare new projections corresponding with the moment the Merger Agreement was executed.  Again, Plaintiffs do not aver any facts showing that the June or August Projections had their reliability confirmed by Ocera's performance or that the Board otherwise knew or should have known that the November Projections were unreliable.  Plaintiffs' negligence theory requires the implausible inference that, despite all of the precautions taken in the review process, the absence of improper bias or dereliction of duty, the risks associated with OCR-002's development, and the company's need to revise its projections in light of several potential bidders withdrawing from negotiations after conducting due diligence, the Defendants negligently undervalued the company.  Responding to external business factors does not give rise to an inference of caving to coercive powers.  The PSLRA requires more from Plaintiffs' Complaint.

Therefore, Defendants' motion to dismiss the Section 14(e) claims is granted.  Since it is not clear that the Plaintiffs would be unable to cure the deficiencies in an amended pleading, Plaintiffs are granted leave to amend.  In the amended complaint, Plaintiffs must address negligence as to each Defendant (i.e., "lumping together" of Defendants will not be accepted).  Plaintiffs correctly note that there is a legal debate regarding whether negligence can be a state of mind, or is only culpable conduct that fails to meet a specified standard of care, in the context of applying the PSLRA to section 14 claims.  *See Beck v. Dobrowski*, 559 F.3d 680, 682 (7th Cir. 2009) ("[N]egligence is not a state of mind; it is a failure . . . to come up to the specified standard of care.").  Nevertheless, *Varjabedian* requires Plaintiffs to plead with particularity how each Defendant was negligent, such as by clearly articulating the duty each Defendant had to the

United States District Court
Northern District of California

1    Plaintiffs and how their failure to satisfy that duty gave rise to negligence.  Additionally, Plaintiffs

2    must plead with particularity how the Recommendation Statement and Supplemental Disclosure

3    were materially misleading or omitted material information, not simply incomplete.  Finally,

4    Plaintiffs must account for the entirety of public filings on which they rely, and not simply invoke

5    selective quoting to make their claims.

6         *E. Loss Causation*

7         Plaintiffs also fail adequately to aver with particularity loss causation.  Loss causation

8    requires a showing that the defendant caused the loss for which the plaintiff seeks to recover

9    damage, and plaintiff must prove both economic loss and proximate causation.  *N.Y. City Emps.'*

10   *Ret. Sys. v. Jobs*, 593 F.3d 1018, 1023 (9th Cir. 2010), *overruled on other grounds by Lacey v.*

11   *Maricopa Cty.*, 693 F.3d 896 (9th Cir. 2012).  The Ninth Circuit has held in the section 14(a)

12   context that a plaintiff must connect misstatements or omissions in a shareholder proxy statement

13   with an actual economic harm.  *Id.*  Here, plaintiffs have not connected any misstatements or

14   omissions in the Recommendation Statement or Supplemental Disclosure with an actual economic

15   harm.  Plaintiffs' only assertion in the Complaint is "as a direct and proximate result of the

16   dissemination of the false and/or misleading Recommendation Statement . . . , Plaintiffs . . . have

17   suffered damage and actual economic losses" measured as the difference between the price Ocera

18   stockholders received and the "true value" of their shares at the time of the merger.  (Compl.

19   ¶ 102.)  This is a mere legal conclusion and fails to allege that Plaintiffs suffered actual economic

20   harm as a result of any alleged misstatement or omission.  *Cf. Krieger v. Atheros Commc'ns, Inc.*,

21   No. 11-CV-00640-LHK, 2012 WL 1933559, at *7 (N.D. Cal. May 29, 2012) (dismissing claim

22   under section 14(a) where "the [complaint] does not connect any proxy misstatements or

23   omissions with an actual economic harm").  Under the PSLRA and Rule 9(b), Plaintiffs need do

24   more to plead loss causation.  Their invocation of *Plaine v. McCabe*, 797 F.2d 713, 722 (9th Cir.

25   1986) to the contrary is misplaced, as that decision predates the PSLRA, and so is not binding

26   upon and of limited persuasive value in this case.  "[C]onclusory allegations of law and

27   unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim."

28

*Caviness*, 590 F.3d at 812 (internal quotation marks and citation omitted).

      *F. Plaintiffs' Section 20(a) Claims*

      Plaintiffs' Section 20(a) claims are derivative of their Section 14(e) claims.  *See Varjabedian*, 888 F.3d at 409.  Thus, the Section 20(a) claims fall with those claims.

<b>V. CONCLUSION</b>

      For the foregoing reasons, Defendants' motion to dismiss is granted.  The Section 14(e) claims and Section 20(a) claims are dismissed with leave to amend.  In the event that Plaintiffs elect to file an amended complaint, they must do so no later than November 6, 2018.

**IT IS SO ORDERED**.

Dated: October 16, 2018

_____
RICHARD SEEBORG
United States District Judge

United States District Court
Northern District of California